**Document Retrieval Result**                                   Westlaw


EXHIBIT A-1

Alexander v. Haymon
254 F.Supp.2d 820
S.D.Ohio,2003.
Jan 14, 2003

C

254 F.Supp.2d 820

United States District Court,
S.D. Ohio,
Western Division.
Philmore ALEXANDER, et al., Plaintiffs,
v.
Al HAYMON, et al., Defendants.
No. C-3-01-122.
Jan. 14, 2003.

Driver and passengers brought action arising from alleged wrongful police stop against concert promoter, city police officers, and police sergeant who were working overtime outside concert venue, and state university police officer. On defendants' motions for summary judgment and plaintiffs' motion for leave to amend complaint and to strike, the District Court, Rice, Chief Judge, held that: (1) reasonable suspicion that there were weapons inside vehicle provided basis for stopping vehicle; (2) no reasonable person would conclude that driver or passengers had been arrested, so as to support unlawful arrest claim; (3) officers' use of force during investigatory stop was minimal at most and, as a result, did not support excessive force claim; (4) officer acted reasonably in informing fellow officers of possibility that there were weapons in vehicle, and sergeant had reasonable and articulable basis for making original radio broadcast regarding weapons in vehicle; (5) sergeant was entitled to qualified immunity; (6) although second cause of action did not state cognizable, university police officer had to move for summary judgment on claim; and (7) concert promoter could not be held liable under either indemnity provision or "solely responsible" provision of lease agreement for concert venue. Defendants' motions for summary judgment sustained; other motions overruled as moot.

West Headnotes

[1] KeyCite this headnote

78 Civil Rights
    78III Federal Remedies in General
        78k1304 k. Nature and Elements of Civil Actions. Most Cited Cases
        (Formerly 78k196.1, 78k192)

To succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. 42 U.S.C.A. § 1983.

[2] KeyCite this headnote

78 Civil Rights

     78III Federal Remedies in General
        78k1305 k. Substantive or Procedural Rights. Most Cited Cases
           (Formerly 78k193)

By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere. 42 U.S.C.A. § 1983.

[3] KeyCite this headnote

350H Sentencing and Punishment
     350HVII Cruel and Unusual Punishment in General
        350HVII(A) In General
           350Hk1433 k. Necessity of Criminal Conviction. Most Cited Cases

Eighth Amendment could only be invoked by persons convicted of crimes and not by driver and passengers as basis for § 1983 claim arising from alleged wrongful police stop. U.S.C.A. Const.Amend. 5; 42 U.S.C.A. § 1983.

[4] KeyCite this headnote

92 Constitutional Law
     92II Construction, Operation, and Enforcement of Constitutional    Provisions
        92k44 Determination of Constitutional Questions
           92k46 Necessity of Determination
              92k46(2) k. Form and Sufficiency of Objection or Allegation. Most Cited Cases

Invocation of Fifth Amendment for the protections of its due process clause was redundant, given fact that citizens of States take their due process protections directly from the Fourteenth Amendment. U.S.C.A. Const.Amends. 5, 14.

[5] KeyCite this headnote

35 Arrest
     35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
           35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

It was a crime in Ohio to carry a concealed weapon and to keep a loaded and accessible weapon inside a motor vehicle and, thus, reasonable suspicion that there were weapons inside vehicle provided basis for stopping vehicle. Ohio R.C. §§ 2923.12, 2923.16(B).

[6] KeyCite this headnote

35 Arrest
     35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
           35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

The police may stop a vehicle if they have reasonable suspicion that criminal activity has been or is being committed.

[7] KeyCite this headnote

35 Arrest

    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases

Claims that law enforcement officers used excessive force in the course of investigatory stop would be analyzed under Fourth Amendment and its reasonableness standard, rather than under a substantive due process approach. U.S.C.A. Const.Amend. 4.

[8] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(3) k. What Constitutes Arrest. Most Cited Cases

No reasonable person would conclude that driver or passengers had been arrested during detention, the duration of which had varying estimations, ranging from "not long at all" to a "guess" of 15 to 20 minutes, so as to support unlawful arrest claim.

[9] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion, Etc. Most Cited Cases

While the Fourth Amendment guarantees that government officials may not subject citizens to unreasonable searches or seizures without proper authorization, police only need a reasonable suspicion of criminal activity to conduct a brief investigatory detention. U.S.C.A. Const.Amend. 4.

[10] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(3) k. What Constitutes Arrest. Most Cited Cases

Where a purported detention is in important respects indistinguishable from a traditional arrest, the seizure of a person may be considered an actual arrest.

[11] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(7) k. Mode of Stop; Warnings; Arrest Distinguished. Most Cited Cases

There is no bright line between a mere *Terry* stop and a detention that rises to the level of an actual arrest, and when determining whether a stop absent probable cause is reasonable under *Terry*, the facts should be judged against an objective standard.

[12] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases

Precautionary manner in which driver was handcuffed and placed inside police transport van was clearly reasonable, as a matter of law, where officers were acting pursuant to report from another officer of possible weapons in driver's vehicle.

[13] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases

Some degree of physical coercion or threat thereof is constitutionally acceptable when police officers are effecting a stop or full arrest.

[14] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases

Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment; the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments, in circumstances that are tense, uncertain, and rapidly evolving, about the amount of force that is necessary in a particular situation. U.S.C.A. Const.Amend. 4.

[15] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k68 Mode of Making Arrest
            35k68(2) k. Use of Force. Most Cited Cases

Police officers' use of force during investigatory stop was minimal at most and, as a result, did not support excessive force claim; none of the passengers claimed that he or she was physically harmed by any officer, who conducted standard and perfunctory pat downs for weapons pursuant to their investigatory stop, and there was no evidence that back pain driver suffered, on account of his having to get on his knees, was a severe or lasting pain, or, moreover, that it was caused by physical force of any officer.

[16] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

Officers had reasonable and articulable basis to stop vehicle and to conduct a minimally intrusive search for weapons, based on fellow officer's report that there was possibility that weapons were inside vehicle, even though officers were, in the end, wrong about their suspicions, and innocent children, some of them quite young, received quite a scare, likely even a shocking or traumatic scare, from officers who accosted vehicle and ordered them out and to ground at gunpoint.

[17] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion,    Etc. Most Cited Cases

A police officer may formulate his or her reasonable suspicion for conducting search based on information received from fellow officers.

[18] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion,    Etc. Most Cited Cases

The *Terry* doctrine exists for purpose of forgiving a minimum amount of intrusion into innocent individuals' lives, provided there is a reasonable and articulable basis for doing so, in exchange for the peace of mind of knowing whether such individuals truly are innocent.

[19] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

Officer acted reasonably in informing fellow officers of the possibility that there were weapons in vehicle; officer was merely relaying sergeant's report, and he had no reason to dispute such, in light of independent tip that vehicle had weapons inside of it.

[20] KeyCite this headnote

349 Searches and Seizures
    349I In General
        349k40 Probable Cause
            349k41 k. Hearsay; Informers; Collective Knowledge. Most Cited Cases

Where an informant is known to the police, such that he can be found and questioned for his own misconduct if it turns out there was no factual basis for his tender of information, it is reasonable and justifiable for an officer to rely on such information to conduct search.

[21] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

Police sergeant had reasonable and articulable basis for making radio broadcast about possibility of there being weapons in vehicle; sergeant had already been forewarned by other officers to look out for weapons possession, he was concerned for safety of his fellow officers given "reputation for violence and rioting" at past events at which same musicians had performed, he knew of weapons possession and drug arrests when same musicians had performed at concert venue, he perceived crowd as restless, owing to failure of headlining act to perform, other fights had already broken out in and outside arena, and vehicle proceeded at slow pace as it passed fellow officers.

[22] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(3) Grounds for Stop or Investigation
                35k63.5(4) k. Reasonableness; Reasonable or Founded Suspicion,   Etc. Most Cited Cases

In reviewing the actions of a police officer to see if he acted with reasonable suspicion that the detainee was engaging in criminal conduct, the court must consider the totality of the circumstances to see whether he had a particularized and objective basis for suspecting legal wrongdoing.

[23] KeyCite this headnote

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(6) k. Sheriffs, Police, and Other Peace Officers. Most Cited Cases
                  (Formerly 78k214(6))

Even if police sergeant did not have reasonable and articulable basis for making radio broadcast about possibility of there being weapons in vehicle, he was entitled to qualified immunity in § 1983 lawsuit brought by driver and passengers; driver and passengers did not have a "clearly established" right to immunity from suspicions of sergeant after he was informed by two detainees that driver and passengers had weapons inside of their vehicle. 42 U.S.C.A. § 1983.

[24] KeyCite this headnote

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(2) k. Good Faith and Reasonableness; Knowledge and   Clarity of Law; Motive and Intent, in General. Most Cited Cases
                  (Formerly 78k214(2))

For a public officer to be held accountable under § 1983, the right she is charged with violating must be clearly established, and be one of which a reasonable officer in her position would have known and the "clearly established law" that forms the focal point of the court's inquiry must be defined with particularity, and not in the abstract. 42 U.S.C.A. § 1983.

[25] KeyCite this headnote

78 Civil Rights
    78III Federal Remedies in General
        78k1425 Questions of Law or Fact
            78k1432 k. Defenses; Immunity and Good Faith. Most Cited Cases
                (Formerly 78k244)

While reasonableness in the Fourth Amendment context will often be left to the trier of fact to determine if the facts are disputed, reasonableness in the § 1983 qualified immunity context ordinarily should be decided by the court long before trial. U.S.C.A. Const.Amend. 4; 42 U.S.C.A. § 1983.

[26] KeyCite this headnote

35 Arrest
    35II On Criminal Charges
        35k63.5 Investigatory Stop or Stop-And-Frisk
            35k63.5(6) k. Motor Vehicles, Stopping. Most Cited Cases

Concert venue was not a "high crime area" on night of rap concert, for purposes of evaluating reasonableness of officers' suspicions in stopping vehicle that allegedly contained weapons; there was no evidence that concert generated any more criminal activity than any other type of music concert, large sporting event, or even political demonstration, and, while restlessness of crowd and public safety in general were bona fide factors that police had to consider, this would be so at any concert.

[27] KeyCite this headnote

268 Municipal Corporations
    268XII Torts
        268XII(B) Acts or Omissions of Officers or Agents
            268k747 Particular Officers and Official Acts
                268k747(3) k. Police and Fire. Most Cited Cases

Driver and passengers failed to state a cause of action against local law enforcement officers cognizable under the laws of Ohio or the United States, despite use of terminology that was suggestive of any number of causes of action recognized in the law, but which did not articulate a more definite claim.

[28] KeyCite this headnote

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1088 Police, Investigative, or Law Enforcement Activities
            78k1088(4) k. Arrest and Detention. Most Cited Cases
                (Formerly 78k133)

Assuming driver and passengers intended to state a racial profiling claim against police officers,

officers' alleged use of foul language, in commanding passengers and driver to exit vehicle and get on ground, was not unusual under the circumstances, let alone racially motivated.

[29] KeyCite this headnote

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(C) Summary Judgment
         170AXVII(C)3 Proceedings
           170Ak2533 Motion
              170Ak2533.1 k. In General. Most Cited Cases

University police officer was not entitled to summary judgment on indecipherable cause of action asserted by driver and passenger, where officer did not move for such.

[30] KeyCite this headnote

37 Assault and Battery
   37I Civil Liability
      37I(A) Acts Constituting Assault or Battery and Liability Therefor
         37k1 Nature and Elements of Assault and Battery
           37k3 k. Intent and Malice. Most Cited Cases

Assuming driver and passengers intended to assert a claim for common law assault, finding that actions of police officers' in stopping vehicle were reasonable made it impossible to infer that officers may nevertheless have been malicious or reckless, as was required to establish assault claim. Ohio R.C. § 2744.03(A)(6)(b).

[31] KeyCite this headnote

37 Assault and Battery
   37I Civil Liability
      37I(A) Acts Constituting Assault or Battery and Liability Therefor
         37k1 Nature and Elements of Assault and Battery
           37k2 k. In General. Most Cited Cases

The tort of assault, under Ohio law, is the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact.

[32] KeyCite this headnote

376 Theaters and Shows
   376k6 Liabilities for Injuries to Persons Attending
      376k6(10) Particular Duties Toward Spectators
         376k6(14) k. Protection Against Crowds, Assaults and Acts of Others, and Ushering in General. Most Cited Cases

Concert promoter could not be held liable under either indemnity provision or the "solely responsible" provision of lease agreement for concert venue, even if concertgoers could otherwise show that they, as members of the "attending public," were harmed by police officers or private security personnel during police stop in parking lot; promoter was incapable of hiring and employing police officers serving in their official capacities, he was not, in any event, even responsible for employing venue security, and neither venue nor any individual private security officers was named as defendant in concertgoers' civil action based on their alleged unlawful

arrests.

***824** James R Greene, III, James R Greene III & Associates, Carol Jacobi Holm, Dayton, OH, for Philmore Alexander, Herbert C Hines, Jr, Carnetta Vines and Edward J Vines.
Matthew D Stokely, Jonathan Bernard Freeman, Altick & Corwin, Dayton, OH, for Al Haymon.
Jeffrey Charles Turner, Surdyk Dowd & Turner Co LPA, Dayton, OH, for Lee Cyr, G R Mader, and Greg Nmi Baker.
Terence Leslie Fague, Coolidge Wall Wonsley & Lombard, Dayton, OH, for Daniel Shuman.

EXPANDED OPINION SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT HAYMON (DOC. # 25), SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS CYR, MADER AND BAKER (DOC. # 26), SUSTAINING MOTION FOR SUMMARY JUDGMENT OF DEFENDANT SHUMAN (DOC. # 28) AND OVERRULING, AS MOOT, PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT (DOC. # 32), PLAINTIFFS' MOTION TO STRIKE DEFENDANT SHUMAN'S EXPERT WITNESS AFFIDAVIT AND REPORT (DOC. # 50), DEFENDANTS' MOTIONS TO STRIKE EXPERT WITNESS REPORTS AND PREVENT PLAINTIFFS' WITNESSES FROM TESTIFYING AT TRIAL (DOC. # s 53 & 57) AND PLAINTIFFS' MOTIONS TO STRIKE DEFENDANTS' MOTIONS TO STRIKE (DOC. # s 58 & 59); DEFENDANT SHUMAN DIRECTED TO FILE, WITHIN 10 DAYS FROM DATE, A MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' SECOND CAUSE OF ACTION; THIS IS NOT A FINAL APPEALABLE ORDER

RICE, Chief Judge.
This civil action arises from an alleged wrongful police stop. Plaintiffs are Philmore Alexander, Javona Alexander, [FN1] LaKiesha Alexander, [FN2] LaQuita Alexander, [FN3] Herbert C. Hines, Jr., Tammy Hines, Tanisha Hines, Carnitta Vines, [FN4] and Edward J. Vines. Defendants are Al Haymon, Lee Cyr, G.R. Mader, Greg Baker, and Daniel Shuman. Defendants Cyr and Mader were, at the time of the events giving rise to this litigation, police officers with the City of Fairborn, and Defendant Baker ***825** was a sergeant. Defendant Shuman was also a police officer at the time, with the Wright State University ("WSU") Department of Public Safety. [FN5] In their Complaint (Doc. # 1), the Plaintiffs set forth three causes of action, though only one is clearly stated: 1) violations of their rights guaranteed by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. §§ 1983, 1985 & 1988 (First Cause of Action); 2) as discussed below, the Second Cause of Action is indecipherable; and 3) assault, and/or violations of their constitutional rights, in particular that of the right to due process (Third Cause of Action). Presently before the Court are the Motions for Summary Judgment of Haymon (Doc. # 25), Officers Cyr and Mader, and Sgt. Baker (Doc. # 26), and Officer Shuman (Doc. # 28). The Court shall sustain these motions for the reasons set forth herein. A number of other motions have also been filed with the Court, which it shall overrule, as moot. [FN6]

> FN1. This Plaintiff's name is spelled "Javora" on the Complaint.

> FN2. This Plaintiff's name is spelled "LaKiesh" on the Complaint.

> FN3. This Plaintiff's name is spelled "LaXinta" on the Complaint.

> FN4. This Plaintiff's name is spelled "Carnetta" on the Complaint.

> FN5. This is a sworn police position with arrest powers, not to be confused with a security guard position. (Shuman Depo. at 20-21.)

> FN6. *See* Plaintiffs' Motion for Leave to Amend Complaint (Doc. # 32), Plaintiffs' Motion to Strike Defendant Shuman's Expert Witness Affidavit and Report (Doc. # 50), Defendants' Motions to Strike Expert Witness Reports and Prevent Plaintiffs' Witnesses from Testifying at Trial (Doc. # s 53 & 57) and Plaintiffs' Motions to Strike Defendants' Motions to Strike (Doc. # s 58 & 59).

I. *Background Facts* [FN7]

> FN7. For purposes of ruling on the Defendants' Motions for Summary Judgment, the Court will construe the facts, and all reasonable inferences drawn therefrom, in the light most favorable to the Plaintiffs, who are the non-moving parties.

Philmore Alexander and Herbert Hines, both adults, are cousins. (H.C. Hines Depo. at 42.) Philmore Alexander is the father of Javona, LaKeisha, and LaQuita Alexander. (Philmore Alexander Depo. at 6.) Herbert Hines is the father of Tammy and Tanisha Hines. (H.C. Hines Depo. at 33.) Edward J. Vines is the father of Carnitta Vines. (Carnitta Vines Depo. at 7.) On the night of March 1, 2000, the Plaintiffs, with the exception of Edward J. Vines, [FN8] attended a rap music concert at the WSU Ervin J. Nutter Center ("Nutter Center"). (Philmore Alexander Depo. at 31, 37.) They rode in a Chevrolet Suburban. (*Id.* at 33.) The driver and passenger side windows of the Suburban had a custom tint to them, and the side-panel and back windows had a darker factory tint. (*Id.* at 38-41.) At the time, Javona Alexander was 16 years old (Javona Alexander Depo. at 6), LaKiesha Alexander was 13 (LaKiesha Turner Depo. at 7), [FN9] LaQuita Alexander was about 10 (Philmore Alexander Depo. at 6), Tammy Hines was about 9 (H.C. Hines Depo. at 33), Tanisha Hines was 7 or 8 (Tanisha Hines Depo. at 6), [FN10] and Carnitta Vines was 19. (Carnitta Vines Depo. at 6.)

> FN8. Two other persons who are not parties to this lawsuit were also in the Plaintiffs' party. (Philmore Alexander Depo. at 34.)

> FN9. LaKeisha Alexander's deposition has been filed with the Court under the name Turner. She explained at her deposition that while she identifies herself as LaKeisha Turner at school, she goes by Alexander everywhere else. (LaKeisha Turner Depo. at 6.)

> FN10. At her deposition, given on April 24, 2002, Tanisha stated that she was 10 years old, but also that she was born on November 19, 1992. As that is impossible, it follows that she was either 9 years old at the time she gave her deposition, or was born in 1991.

The concert was promoted and produced by Al Haymon, dba Haymon Entertainment ("Haymon"). (Doc. # 25 at Ex. 1 ("Lease Agreement"); Compl. ¶ 8.) The Nutter Center, as the lessor of its arena, agreed to provide "building security" for the event. (Lease Agreement ¶ 4.) Although responsible for providing separate security for the musicians, to the extent they required any, Haymon was not authorized to hire any other security personnel except through the Nutter Center. (*Id.*) As the lessee of the Nutter Center, Haymon ***826** agreed to "indemnify, defend and hold harmless Lessor, including its officers, employees, students and trustees, from any and all claims for personal injuries or property damage resulting from the negligence or malfeasance of Lessee, its employees, licenses [sic], or agents of the Arena used by Lessee hereunder," and also agreed that he would be "solely responsible for the safety and welfare of [his] employees, licensees, agents and the attending public." (*Id.* ¶ 12(b) & (c).)

That night, Sgt. Baker and Officers Mader and Cyr were working overtime, or "extra-duty" as they refer to it, in their official police capacities, patrolling the outside grounds of the Nutter Center. (Baker Aff., Doc. # 26 at Ex. A, ¶ 3; Mader Aff., Doc. # 26 at Ex. B, ¶ 3; Cyr Aff., Doc. # 26 at Ex. C, ¶ 3; Barlow Depo. at 86.) Officer Shuman was also working overtime. (Shuman Depo. at 50-51.) A separate, private security force was hired to keep the peace inside the Nutter Center. (Barlow Depo. at 22.) Officers Cyr and Shuman were paired to form an "arrest team," which meant that they were to man a Fairborn Police Department transport van for purposes of transporting any arrestees. (Shuman Depo. at 34-35, 40, 75, 128 & Ex. 7; Cyr Aff. ¶ 6.) The Fairborn police officers had been forewarned that evening that weapons possession on the part of concert goers might be a problem. (Baker Aff. ¶ 4; Mader Aff. ¶ 4; Cyr Aff. ¶ 4.)

Inside the Nutter Center, several "opening" bands played their sets, but later in the evening, after the crowd had been waiting about 40 minutes for the headlining band to come on stage, word circulated that they were cancelling their appearance. (Philmore Alexander Depo. at 42.) When this word reached the Plaintiffs, they sensed the crowd growing restless and possibly dangerous, and decided to leave. (*Id.* at 42-43.) Once outside the arena, in the parking lot, Philmore Alexander observed a large police presence patrolling the venue grounds. (*Id.* at 47.) In fact, a fight had broken out outside the gate through which the Plaintiffs had exited the arena, Gate 2, to which several officers were responding. (*Id.* at 46-47; H.C. Hines Depo. at 62-67; Tanisha Hines Depo. at 11-13; Carnitta Vines Depo. at 68-75; LaKeisha Turner Depo. at 28.) Tanisha Hines remembers one of the youths involved in the melee state that somebody in the Plaintiffs' party had a gun. (Tanisha Hines Depo. at 12- 13 & 15.)

When they got into the Suburban to leave, Philmore Alexander was in the passenger seat, Herbert Hines was driving, and the children were in the back seats. (Philmore Alexander Depo. at 48.) As they were about to leave, Tanisha Hines heard a boy who had been detained by the police state that there was a gun inside the Plaintiffs' Suburban. (Tanisha Hines Depo. at 16.) Proceeding slowly through the parking lot, they at one point came to within about 20 feet of a man being apprehended by several police officers. (Philmore Alexander Depo. at 49.)

After the Plaintiffs made several turns in the parking lot as they meandered toward the exit, Officers Cyr and Shuman, who had been following their Suburban in the police transport van, suddenly turned on their emergency lights and stopped them. (*Id.* at 51-53; H.C. Hines Depo. at 69-72; Cyr Aff. ¶ 7; Shuman Depo. at 87-89.) Another police vehicle blocked the Plaintiffs' passage in front. (Philmore Alexander Depo. at 53.) A third police vehicle also arrived and blocked their passage in front. (H.C. Hines Depo. at 75 & Ex. 2.) Officers Cyr and Shuman initiated the stop after receiving word from Officer Mader, over police radio, that the Plaintiffs' Suburban had weapons inside of it. *827 (Shuman Depo. at 85-88, 95 & Ex. 10; Mader Aff. ¶ 17; Cyr Aff. ¶ 8.) Officer Mader, for his part, had received the information about the alleged weapons inside the Suburban from Sgt. Baker. (Baker Aff. 16; Mader Aff. ¶ 9.) [FN11] He also received an independent tip that weapons were inside the Suburban from an individual by the name of Dartagnan Hill, whom he and his security team partner, Fairborn Police Officer Doug Collie, had identified and were in the process of questioning for other reasons as the Suburban drove past them. (Mader Aff. ¶¶ 7, 8 & 13.) Finally, for his part, Sgt. Baker had gotten his information about the alleged weapons inside the Suburban from two individuals who had been detained (but not identified) by WSU Department of Public Safety police officers for their involvement in the fight which had taken place outside of Gate 2. (Baker Aff. ¶¶ 9-11.)

> FN11. The unofficial police radio broadcast transcript upon which both parties rely indicates that Sgt. Terry Barlow (of the Fairborn Police Department), not Baker, made the communication about the alleged weapons immediately preceding Officer Mader's relay communication to Officers Cyr and Shuman. (Shuman Depo. at Ex. 10.) It is not certain how many radio lines the police had open, or whether Sgt. Baker made a separate communication directly to Officer Mader. Regardless, it is not disputed that Sgt. Baker initiated the weapons alert, and it does not matter for purposes of the Court's Decision herein whether the relay to Mader went through Sgt. Barlow. (*See* Barlow Depo. at 45-55.)

Because of the report of weapons, Officers Cyr and Shuman conducted what they term a "felony traffic stop." (Cyr Aff. ¶ 14; Shuman Depo. at 130-131.) The stop was not based on any observed violation of traffic laws, and they did not call in the license plate number to their dispatch to have it checked. (Shuman Depo. at 99.) Communicating in loud voices and perhaps even through a bullhorn, they commanded the Plaintiffs to stick their hands out of the windows. (Philmore Alexander Depo. at 53; H.C. Hines Depo. at 75; Shuman Depo. at 89-91.) Officer Cyr was shouting at the Plaintiffs from his position on the rear, driver's side of the Suburban, while Officer Shuman was shouting at them from his position on the rear, passenger's side. (Shuman Depo. at 89- 90.) The Plaintiffs were shouting out the window that they had children in the Suburban, and inquired in a rather panicked state into why they were being stopped. (Philmore Alexander Depo. at 51 & 54; H.C. Hines Depo. at 77.) LaKeisha Alexander remembers Herbert Hines shouting "Don't shoot, it's a cell phone," referring to a phone that was in his hand. (LaKeisha Turner Depo. at 32, 33; *see also* Cyr Aff. ¶ 16.) After being told to put their hands out the windows, they were told to exit the vehicle. (Philmore Alexander Depo. at 51; Shuman Depo. at 92; Cyr Aff. ¶¶ 18-19.)

At Officer Shuman's gunpoint, Philmore Alexander stepped out of the Suburban and got down on the ground, at which point he was frisked by Officer Shuman, but not otherwise punched, kicked, or physically harmed. (Philmore Alexander Depo. at 51, 55, 59-61; Carnitta Vines Depo. at 85.) Herbert Hines, after being told to "get his ass out of the vehicle," exited on the driver's side and realized that several officers had their guns drawn on him. (H.C. Hines Depo. at 78, 89.) Officer Cyr told him to get on the ground. (*Id.*; Cyr Aff. ¶ 20.) When he mentioned that he had a bad back, the officers yelled at him again to "get his ass on the ground." (H.C. Hines at 79, 90.) He then dropped to his knees, at which point he was handcuffed by Officer Cyr. (*Id.* at 80; Cyr Aff. ¶ 24.) In the process of getting on his knees, Herbert Hines hurt his back. (H.C. Hines Depo. at 80.) Once handcuffed, he was assisted to his feet by Officer Cyr and **\*828** escorted to the transport van. (*Id.* at 82; Cyr Aff. ¶ 25.) He asked what he had done, but did not receive a response. (H.C. Hines Depo. at 83.)

The children were also commanded by Officer Shuman, at gunpoint, to exit the vehicle and lay on the ground, which several, but not all, of them did, without physical coercion from the officers. (Philmore Alexander Depo. at 52 & 62; H.C. Hines Depo. at 83-84; Carnitta Vines Depo. at 86-101; Javona Alexander Depo. at 22-26; LaKeisha Turner Depo. at 35-36; Shuman Depo. at 93-94.)

The police searched for, but did not find, weapons in the Suburban. (Shuman Depo. at 118.) No arrests were made, and the Plaintiffs were released after about 10-20 minutes, with apologies from the police. (Philmore Alexander Depo. at 51; H.C. Hines Depo. at 88; Carnitta Vines Depo. at 101; Shuman Depo. at 106.) For about five minutes after the Plaintiffs were told they were free to leave, the Plaintiffs asked the officers for their badge numbers and for an explanation of why they had been detained, but to no avail, as the police disbursed without response. (Philmore Alexander Depo. at 57 & 63; H.C. Hines Depo. at 87; Carnitta Vines Depo. at 103-105; Javona Alexander Depo. at 28- 29.) At no time during the Plaintiffs' detention did the police explain their purpose. (Philmore Alexander Depo. at 65; H.C. Hines Depo. at 83.)

There is no evidence that any of the Plaintiffs were physically assaulted or harmed. (Philmore Alexander Depo. at 61; H.C. Hines Depo. at 85- 86 & 88; Tanisha Hines Depo. at 18; Carnitta Vines Depo. at 101 & 110; Javona Alexander Depo. at 26; LaKeisha Turner Depo. at 36.) [FN12] There is also no evidence that any of the officers, all of whom are apparently white, made any racial slurs during their detention of the Plaintiffs, all of whom are apparently black. (Philmore Alexander Depo. at 67 & 79; H.C. Hines Depo. at 96; Tanisha Hines Depo. at 18; Carnitta Vines Depo. at 118; Javona Alexander Depo. at 26-27; LaKeisha Turner Depo. at 37.)

> FN12. Javona Alexander stated at her deposition that although she was not physically touched as she exited the vehicle, she observed that the police did touch Philmore Alexander, Herbert Hines, and LaKiesha Alexander. (Javona Alexander Depo. at 24.) The Court discounts this statement because those three individuals all stated that they were not touched as they exited the Suburban. (Philmore Alexander Depo. at 55; H.C. Hines Depo. at 78-80; LaKeisha Turner Depo. at 35-36.) The Court also discounts the statement

of LaKeisha Alexander, who added that she saw the police push Herbert Hines to the ground as he exited the Suburban. (LaKeisha Turner Depo. at 47-48.) Herbert Hines' own deposition testimony reveals that the officers were at a distance as he exited the Suburban, and

that he was not touched until he was already kneeling on the ground, at which point he was handcuffed. (H.C. Hines Depo. at 78-80.) Finally, although Philmore Alexander thought that he might have been touched as he dropped to the ground with his hands behind his head, he stated that he was not hurt in the process. (Philmore Alexander Depo. at 51, 55, 59-60.)

The Defendants have all submitted straightforward motions for summary judgment, contending that the Plaintiffs have failed to adduce material facts creating any genuine issue on which reasonable minds might disagree. The Plaintiffs disagree. The Court agrees with the Defendants and will sustain the motions.

II. *Standards Governing Motions for Summary Judgment*

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *829 Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Of course, the moving party:

always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id. at 323, 106 S.Ct. 2548; see also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir.1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir.1987)). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)(quoting Fed.R.Civ.P. 56(e)). Thus, "[o]nce the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1245 (6th Cir.1995). Read together, Liberty Lobby and Celotex stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law, Fed.R.Civ.P. 50). Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also Michigan Protection and Advocacy Serv., Inc. v. Babin, 18 F.3d 337, 341 (6th Cir.1994) ("The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324, 106 S.Ct. 2548. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir.1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a