court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... ***830** obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir.1989), cert. denied, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990); *see also L.S. Heath & Son, Inc. v. AT & T Information Sys., Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992)("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment ..."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

III. *Analysis*

The Court will address the Motions for Summary Judgment of Defendants Cyr, Mader and Baker (Doc. # 26) and Defendant Shuman (Doc. # 28) together, and then that of Haymon (Doc. # 25).

A. *Motions for Summary Judgment of Defendants Cyr, Mader & Baker (Doc. # 26) and Defendant Shuman (Doc. # 28)*

[1][2] With regard to the Plaintiffs' First Cause of Action, 42 U.S.C. § 1983 provides a civil cause of action to any citizen of the United States against any person who, under color of state law, deprives the citizen of "any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Christy v. Randlett,* 932 F.2d 502, 504 (6th Cir.1991) (citations omitted). In order to succeed on a § 1983 claim, a plaintiff must prove two elements: (1) that he was deprived of a right secured by the Federal Constitution or laws of the United States; and (2) that he was subjected to this deprivation by a person acting under the color of state law. *See Searcy v. City of Dayton* 38 F.3d 282, 286 (6th Cir.1994). [FN13] "By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Gardenhire v. Schubert,* 205 F.3d 303, 310 (6th Cir.2000) (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

FN13. Defendants argue in one respect that because the Complaint does not state that they were named in their individual capacities, the

Plaintiffs' § 1983 action can only be construed as one against the City of Fairborn. The Plaintiffs counter that it was not their intent to limit their claim so. The Court will not address this difference of opinion because it is clear that liability cannot attach regardless of the capacity in which the Defendants were named.

As noted, the Plaintiffs have invoked the Fourth, Fifth, Eighth, and Fourteenth Amendments in the First Cause of Action set forth in their Complaint. More specifically, they assert claims for unlawful stop, search and seizure, unlawful arrest, and use of excessive force. These also appear to be the theories advanced in their respective Memoranda Contra. (Doc. # 36 at 14- 21 & Doc. # 37 at 13-15.) In their Memorandum Contra to Defendant Shuman's Motion in particular, they also put forward a Fifth Amendment substantive due process theory of liability, on the ground that the Defendants' actions "shock the conscience." (Doc. # 37 at 15.) This latter theory seems to be advanced a second time under the Due Process Clause of the Fourteenth Amendment. (*Id.* at 17.)

[3][4] Plaintiffs' sources of constitutional protections can be halved from the outset. ***831** The Eighth Amendment, for its part, can only be invoked by persons who have been convicted of crimes. *See Ingraham v. Wright,* 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711

(1977). As for the Fifth Amendment, invoked as it has been by the Plaintiffs for the protections of its Due Process Clause, its invocation is redundant, given the fact that citizens of the States take their due process protections directly from the Fourteenth Amendment. U.S. Const. amend. XIV § 1. Thus, the Fourth and Fourteenth Amendments are all that the Court need consider in this case.

[5] For the reasons which follow, the Court finds that the entirety of the Plaintiffs' § 1983 cause of action is without merit. It is a crime in Ohio to carry a concealed weapon. *See* Ohio Rev. Code § 2923.12. It is also a crime to keep a loaded and accessible weapon inside a motor vehicle. *See id.* § 2923.16(B). In stopping the Plaintiffs' suburban, Officers Cyr and Shuman were responding to Officer Mader's report that there might be weapons inside the vehicle, a report which itself was based on Sgt. Baker's report of same and the independent statement of Dartagnan Hill. (Shuman Depo. at 122, 131 & Ex. 10; Cyr Aff. ¶ 10.) Had the report been accurate, it is plausible that the Plaintiffs would have been in violation of one or both of the above-stated criminal statutes. *See, e.g., State v. Bowman,* 79 Ohio App.3d 407, 607 N.E.2d 516, 518-19 (1992). Officer Shuman stated as much at his deposition. (Shuman Depo. at 131.)

[6] The Sixth Circuit has stated the following:

Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Palomino,* 100 F.3d 446, 449 (6th Cir.1996). The same Fourth Amendment test applies to vehicle stops. *See Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *Palomino,* 100 F.3d at 449. "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). The standard outlined in *Terry* and its progeny is not onerous. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997), *cert. denied,* 523 U.S. 1050, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *McPherson,* 125 F.3d at 993.

*Houston v. Clark County Sheriff Deputy John Does,* 174 F.3d 809, 813 (6th Cir.1999). As *Houston* makes plain, the police may stop a vehicle if they have "reasonable suspicion" that criminal activity has been or is being committed. Whether Officers Cyr and Shuman, the officers who initiated the stop at issue herein, had the requisite reasonable suspicion, is a question the Court will address shortly. First, the Court will address what it believes are the easier questions raised by the Plaintiffs.

**\*832** [7] To the extent the § 1983 claim is premised on an alleged violation of substantive due process, the claim must be dismissed, because, as the Supreme Court clarified over thirteen years ago, "*all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis in original). [FN14] Because all of the underlying events occurred within the context of an investigatory stop, there is no basis for invoking "substantive due process" herein.

> FN14. In other settings, the Supreme Court has recognized that the executive branch of government, which includes municipal police departments, can violate an individual's substantive due process rights if
>
> it treats him in a manner which "shocks the conscience." *See County of Sacramento v. Lewis,* 523 U.S. 833, 846-847, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting cases); *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

[8][9][10][11] The unlawful arrest claim is also without merit, as none of the Plaintiffs was ever arrested. While the Fourth Amendment guarantees that government officials may not subject citizens to unreasonable searches or seizures without proper authorization, *see Gardenhire,* 205 F.3d at 313, "police only need a reasonable suspicion of criminal activity to conduct a brief investigatory detention." *Id.* (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). On the other hand, where a purported "detention" is "in important respects indistinguishable from a traditional arrest," the seizure of a person may be considered an actual arrest. *Id.* (citing *Dunaway v. New York,* 442 U.S. 200, 212-13, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)). As the Supreme Court has commented, there is no bright line between a mere *Terry* stop and a detention that rises to the level of an actual arrest, *see U.S. v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Centanni v. Eight Unknown Officers,* 15 F.3d 587, 590 (6th Cir.) (citing *Florida v. Royer,* 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)), *cert. denied,* 512 U.S. 1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994), and when determining whether a stop in the absence of probable cause is reasonable under *Terry,* the facts should be " 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or search "warrant a man of reasonable caution in the belief" that the action taken was appropriate.' " *U.S. v. Hardnett,* 804 F.2d 353, 356 (6th Cir.1986) (quoting *Terry,* 392 U.S. at 21-22, 88 S.Ct. 1868).

In *Houston,* two § 1983 plaintiffs complained of having been unlawfully pulled over in their car by an officer who was investigating a possible shooting at a location from which they had come. 174 F.3d at 812. The events of that case began when two law enforcement officers arrived at a bar to investigate a reported theft. *Id.* at 811. While there, several fights broke out, and the officers were even attacked by the bar patrons. *Id.* In the midst of the melee, the officers heard what they thought was a gunshot and observed a security guard bleeding profusely. *Id.* Someone in the crowd yelled "he's been shot." *Id.* When one of the officers observed a car speeding out of the parking lot, he suspected that the occupant of the vehicle might be the apparent shooter. *Id.* He broadcast this information over police radio, at which point his partner got into his cruiser and gave chase, eventually pulling over what he believed to be the suspect car. *Id.* at 811-12. Pursuant to the stop, ***833** the § 1983 plaintiffs were ordered out of their car and then restrained in handcuffs in the back of the police cruiser. *Id.* at 812. Even after a consensual search of the car revealed that no weapons were present, and even after the officer at the scene of the purported shooting radioed to the detaining officer that no shooting had actually occurred, the detaining officer continued to question the detainees for several more minutes. *Id.* at 812, 815. The two plaintiffs complained that they had been detained and physically restrained, in handcuffs, for about an hour before they were released without being charged. *Id.* The Sixth Circuit held that under the circumstances, the detention did not develop into a *de facto* arrest for which probable cause of criminal activity was a prerequisite, given that the detaining officer's "inquiries and safety precautions were reasonably related to the initial basis for stopping the car." *Id.* at 815.

[12] Herein, no reasonable person could conclude that any of the Plaintiffs was arrested. They gave varying estimations of how long they were detained, ranging from "not long at all" (H.C. Hines Depo. at 88), to "maybe 10 minutes" (Phillmore Alexander Depo. at 51), to a "guess" of 15 to 20 minutes. (Carnitta Vines Depo. at 101.) While there is no "bright line" between a *Terry* stop and a *de facto* arrest, the Defendant officers surely did not cross any such line in this case. Under the circumstances, assuming for the sake of ruling on summary judgment that the facts adduced by the Plaintiffs are true, reasonable minds could not disagree that the length of their detention was perfectly reasonable. Furthermore, although Herbert Hines was handcuffed and placed inside the transport van, neither fact necessitates a finding that he was arrested. Given the undisputed fact that Officers Cyr and Shuman were acting pursuant to a report from another officer of possible weapons, the precautionary manner in which Herbert Hines was detained was clearly reasonable, as a matter of law. *See, e.g., Houston,* 174 F.3d at 814-15.

[13][14] The excessive force claim must also be rejected. "[S]ome degree of physical coercion or threat thereof" is constitutionally acceptable when police officers are effecting a stop or full

arrest. *Graham,* 490 U.S. at 396, 109 S.Ct. 1865. Importantly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865.

[15] As noted, the Defendants' use of force at the Nutter Center was minimal at most. None of the Plaintiffs claims that he or she was physically harmed by any of the officers, and it would be unreasonable to hold any of the officers liable for conducting standard and perfunctory pat downs for weapons pursuant to their investigatory stop. *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868. Only Herbert Hines claims to have suffered any pain, that being in his back, on account of his having to get on his knees, but there is no evidence that this was a severe or lasting pain, or, moreover, that it was caused by the physical force of any of the Defendants.

[16][17] With respect to the issue of whether Officers Cyr and Shuman had reasonable suspicion to stop the Plaintiffs in their Suburban and conduct a brief search for unlawfully possessed weapons, the Court believes that they did. A police officer may formulate his or her reasonable suspicion based on information received **\*834** from fellow officers. *See Houston,* 174 F.3d at 814; *McPherson v. Kelsey,* 125 F.3d 989, 993-94 (6th Cir.1997), *cert. denied,* 523 U.S. 1050, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). In *Houston,* the officer who conducted the vehicle stop and weapons search was acting pursuant to the radio broadcast from his partner who had described only the taillights of the car which he (the partner) believed was being driven by a suspect in the purported "shooting." 174 F.3d at 812. While there was plenty of reason to suspect that a shooting took place at the bar, the only information which the reporting officer had linking the driver of the speeding car to the purported shooting was the driver's act of speeding away. *Id.* at 813. Moreover, the only information which the detaining officer had linking the car which he actually stopped to the car his partner had observed speeding away was his partner's description of the speeding car's taillights and his misunderstanding that the suspect car was a certain number of cars ahead of his own cruiser. *Id.* at 812. [FN15] Despite having only what was, in hindsight, inadequate information, the Sixth Circuit held that both officers acted with "reasonable suspicion" in reporting, pursuing, and stopping the respective vehicles which they thought were occupied by a person involved in the purported shooting. *Id.* at 813-14.

> FN15. The detaining officer's partner tried to identify the suspect car by noting how many cars there were between it and the detaining officer's cruiser, both of which he apparently observed leaving the bar parking lot. *Houston,* 174 F.3d at 812. The detaining officer, however, misunderstood his partner's broadcast, and thought that his partner had noted the number of cars between the suspect car and a certain intersection toward which both cars were driving. *Id.*

*McPherson,* too, is instructive. In that case, a judge observed a litigant, McPherson, who had been in his court earlier in the day pursuant to a custody dispute with his (McPherson's) former wife, lingering in a court "security area." 125 F.3d at 990-91. The judge was aware, both from his own observations and from reports given him by other court officials, that McPherson was very unhappy with the way his case had been handled by the court, to the point that he had become openly volatile and temperamental. *Id.* After the judge told McPherson to leave the security area and not come back, McPherson was observed lingering just outside the security door. *Id.* at 991. Unknown to the judge and other court officials was that McPherson was pursuing a separate grievance with a court security officer, which had to be taken up with the chief judge of the court. *Id.* Having observed for himself McPherson pacing back and forth outside the security area, the judge asked his clerk to call the sheriff's office for assistance. *Id.* When he did so, the clerk apparently expressed concern that McPherson might have a gun. *Id.* This information was relayed to other officers, an action which in turn precipitated a responsive action by those officers who proceeded to apprehend McPherson, with weapons drawn, and pat him down. *Id.* at 991. When no weapon was found, he was escorted out of the court. *Id.*

McPherson filed a § 1983 action against the judge and the participating court security officers. At trial, a jury found the judge and one of the security officers liable for unreasonable search and seizure, upon which judgment was entered. The Sixth Circuit reversed. *Id.* at 992. As to the officer, the Sixth Circuit held that his belief that McPherson might have had a weapon was reasonable, given that he was merely responding to another officer's report that McPherson might have a weapon, which in turn was based on the phone call from the judge's clerk. *Id.* at 993-94. ***835** The court also held that the judge's actions (and, by implication, those of his clerk) were reasonable given the unruly nature and suspicious activity of McPherson, as had been observed earlier that day. *Id.* at 994.

In the case at bar, nothing submitted by the Plaintiffs indicates that on the night in question, Officers Cyr and Shuman had any reason to doubt the report given by Officer Mader that there might be weapons inside the Suburban. The Plaintiffs have also not adduced any facts tending to show that there were multiple Suburbans in the parking lot, that Officer Mader was in fact describing another Suburban, and that Officers Cyr and Shuman stopped their Suburban by mistake. Indeed, even Tanisha Hines heard on at least one occasion, if not two, somebody identify the Plaintiffs as having weapons in their possession. (Tanisha Hines Depo. at 12-16.) Officer Mader's report of possible illegality, coupled with the officers' duty to protect the public and themselves as thousands of patrons exited the Nutter Center, easily brings the actions of Officers Cyr and Shuman within the purview of the *Houston* and *McPherson* holdings. There being no genuine issues regarding the underlying facts, no reasonable jury could disagree that the officers had an ample basis for formulating a reasonable suspicion that criminal activity had taken place, or was taking place, inside the Suburban, justifying an investigatory stop.

[18] It is not lost on the Court that the officers were, in the end, wrong about their suspicions, and that innocent children, some of them quite young, received quite a scare, likely even a shocking or traumatic scare, from the officers who accosted their Suburban and ordered them out and to the ground at gunpoint. Under the circumstances, however, such actions were well within the bounds of reason. The police are employed to protect the peace, and it would be flimsy protection at that if they were not allowed to investigate reports from other field officers concerning potential criminal conduct. The *Terry* doctrine exists for this very purpose: to forgive a minimum amount of intrusion into innocent individuals' lives, provided there is a reasonable and articulable basis for doing so, in exchange for the peace of mind of knowing whether such individuals truly are innocent. In this case, Officer Mader's report gave Officers Cyr and Shuman a reasonable and articulable basis to stop the Plaintiffs' Suburban and to conduct a minimally intrusive search for weapons. Unfortunate as it may sometimes seem, the Constitution does not guarantee that only the guilty will be subject to searches and seizures. *See Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

To the extent the Plaintiffs argue that the intensity of the search was more intrusive than necessary, the Court need only consider the potential result had they conducted a less intrusive search. Had Officer Mader's report been accurate, to approach the Suburban, darkened as it was by the nighttime hour of the stop and its tinted glass windows, in a more casual manner, i.e., without guns drawn, might well have been foolish. The Plaintiffs try to depict the Defendant officers' actions as excessive for a "traffic stop" (Doc. # 36 at 18; Doc. # 37 at 12), but the truth of the matter is that this was not a traffic stop, and the departmental rules relating to such, be they those of Fairborn or of WSU, were inapplicable. "[W]hen police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are 'reasonably necessary for the protection of the officers.' " *Houston,* 174 F.3d at 814-15 (quoting *United States v. Garza,* 10 F.3d 1241, 1246 (6th Cir.1993)). Nothing more than this occurred in this situation. It is unfortunate, ***836** very much so, that children were involved, but that they were so does not make the officers' actions any less reasonable.

[19][20] The undisputed facts concerning Officer Mader's actions also demonstrate that, as a matter of law, he acted reasonably. In informing Officers Cyr and Shuman of the possibility that there were weapons in the Suburban, he was merely relaying the report of Sgt. Baker, and had no reason to dispute such. Furthermore, he had received an independent tip from Dartagnan Hill, the individual who he and Officer Collie had detained for other reasons, that the Suburban had

weapons inside of it. [FN16] Where an informant is known to the police, such that he can be found and questioned for his own misconduct if it turns out there was no factual basis for his tender of information, it is reasonable and justifiable for an officer to rely on such information. *See Adams v. Williams,* 407 U.S. 143, 146-47, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). The federal courts have also held that the police may use information collected from face-to-face informants in developing a reasonable suspicion of criminal activity. *See, e.g., United States v. Robertson,* 305 F.3d 164, 168-69 (3d Cir.2002); *United States v. Thompson,* 234 F.3d 725, 728-29 (D.C.Cir.2000), *cert. denied,* 532 U.S. 1000, 121 S.Ct. 1667, 149 L.Ed.2d 648 (2001); *United States v. Valentine,* 232 F.3d 350, 354-55 (3d Cir.2000), *cert. denied,* 532 U.S. 1014, 121 S.Ct. 1748, 149 L.Ed.2d 670 (2001); *see also Edwards v. City of Columbus,* 2001 WL 1678785, at *7 (S.D.Ohio 2001). The fact that Officer Mader relayed Sgt. Baker's report that there might be weapons in the Suburban provides a sufficient basis for concluding, as a matter of law, that his report to Officers Cyr and Shuman was reasonable. The fact that he received similar information from Hill, corroborating Sgt. Baker's report, only buttresses this conclusion.

> FN16. Officer Mader also states that the Suburban slowed to a stop near where he and Officer Collie had detained Hill. (Mader Aff. ¶ 11.) According to him, he believed that this seemed suspicious and presented another reason to suspect that the occupants of the Suburban were motivated to commit illegal acts. (*Id.* ¶¶ 15 & 17.) It hardly seems odd for a vehicle to move slowly as it exits a crowded parking lot, although the Plaintiffs are not in agreement on whether there were any cars in front of
>
> them: Philmore Alexander stated there were not (Philmore Alexander Depo. at 50), but Herbert Hines stated that there were. (H.C. Hines Depo. at 71.) In determining the reasonableness of an officer's actions, the Court is to consider the "totality of the circumstances." *See United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). While there seems to be some factual dispute as to why the Suburban was moving slowly, assuming that it was so, such that the Court should not consider this factor in ruling at summary judgment, it is not material in any event because the Court finds Officer Mader's actions reasonable without regard to this matter.

[21] That leaves to be decided whether Sgt. Baker's original broadcast that there might be weapons in the Suburban offends the Fourth Amendment. Assuming *arguendo* that § 1983 liability might attach to him alone, despite the existence of reasonable suspicion on the part of Officers Cyr and Shuman to stop and search the Suburban and its occupants, the issue is whether Sgt. Baker had a reasonable and articulable basis for making the radio broadcast that he did. [FN17] The Court finds that he did.

> FN17. It can be noted in this case that even if Sgt. Baker acted unreasonably in reporting the possibility that weapons were inside the
>
> Plaintiffs' Suburban, an argument could be made that because Officer Mader had an independent basis for reporting the same information to Officers Cyr and Shuman (i.e., the statement of Dartagnan Hill), Sgt. Baker's own actions were not the proximate cause, or at least not the sole proximate cause, of any harm that might have ultimately befallen the Plaintiffs.

**\*837** It is not disputed that Sgt. Baker did not obtain the identities of the two detainees who informed him that there were weapons inside the Suburban. Picking up on this fact, the Plaintiffs contend that these individuals are nothing more than "anonymous tipsters," whose information, and the factual basis therefore, Sgt. Baker did not verify, and who cannot now be held responsible for providing false information. Given this, the Plaintiffs argue that the information the tipsters provided cannot be considered in determining whether Sgt. Baker could have developed a reasonable suspicion that they had weapons in their Suburban. (Doc. # 36 at 15-

16.) This is a sound and logical argument, but it is not supported by the case law.

In the Plaintiffs' favor, the Supreme Court has made it clear that "the bare report of an unknown, unaccountable informant," who does not explain how he is aware that the individual he is reporting has actually engaged in criminal activity, and fails to give any other predictive information (e.g., information about future actions which the suspect plans to take and which the officers can proceed to witness for themselves to corroborate the informant's story), cannot be the sole basis for forming a reasonable suspicion of wrongdoing, such as would be enough to justify a *Terry* stop. *Florida v. J.L.,* 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000). The anonymous tipster in *J.L.* was a telephone informant who reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268, 120 S.Ct. 1375. At a subsequent point in time, two police officers went to the bus stop to investigate the tip. When they arrived, they found three black males standing there, one of whom, J.L., was wearing a plaid shirt. *Id.* The anonymous tip was the sole basis for suspecting J.L. of any criminal wrongdoing. *Id.* The officers approached J.L., frisked him, and seized a gun from his pocket. *Id.* The Supreme Court affirmed the Florida Supreme Court's ruling that the weapon was seized in an unconstitutional manner, necessitating its suppression at trial. *Id.* at 274, 120 S.Ct. 1375. The Supreme Court emphasized that the ends cannot justify the means, and that an anonymous tip without other predictive information provides no indicia of reliability. *Id.* at 271, 120 S.Ct. 1375. "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, [*see Adams v. Williams, supra*], 'an anonymous tip seldom demonstrates the informant's basis of knowledge or veracity.' " *Id.* at 270, 120 S.Ct. 1375 (quoting *White,* 496 U.S. at 329, 110 S.Ct. 2412).

Were the underlying facts to reveal that Sgt. Baker received his tip from an anonymous tipster over the telephone, and acted solely upon the tip in notifying Officer Mader of such information, the Court might agree that a genuine issue of material fact exists as to whether he acted reasonably. Yet, such is not the case, and the lower federal courts have recognized a significant difference between the factual predicate of *J.L.* and a situation such as that at issue herein, where the informants, albeit unknown, were observed in person by the officer relying on the information. For instance, the Third Circuit held that where the police were looking for two robbery suspects, it was lawful for them to rely upon information provided by an unknown man who approached them and told them that the two suspects for whom they were looking had just boarded a bus, despite the fact that they did not ask the man for any personal information about himself, including his name, or the basis for the information he gave. *See Robertson,* 305 F.3d at 166, 168-69. "No doubt in perfect hindsight and with more time, Captain Sullivan might well have asked the ***838** bystander more questions. But elaboration or corroboration in these circumstances can delay-and even terminate-effective pursuit.... If Captain Sullivan had waited to determine if the van driver had a basis for his statement, the fleeing suspects may well have escaped. It is legally insignificant that Robertson [one of the suspects] was not ultimately identified by the victim as the armed robber." *Id.* at 168-69.

In another case decided by the Third Circuit, police patrolling a high crime area were approached at an intersection by a youth who informed them that he had just seen a man with a gun. *Valentine,* 232 F.3d at 352. The youth described the suspect and what he was wearing and stated that he was accompanied by another man. *Id.* When asked for his name, the youth refused to give it. *Id.* Pursuing the tip, the police saw three men standing about 50 to 100 feet from where the youth had approached them, one of whom met the youth's description. *Id.* at 353. They approached their suspect, tackled him when he attempted to flee, and found a weapon. *Id.* The district court suppressed the weapon, but the Third Circuit reversed. That appellate court distinguished the then recently decided case of *J.L.* by noting the recognized difference between anonymous telephone tips and information obtained in face-to-face encounters. *Id.* at 354. The court noted that in face-to-face encounters, the police have an opportunity to assess the informant's credibility on the spot. Furthermore, the court stated that the fear of retribution from an observant suspect, as well as the danger of making oneself accountable to the police for providing false information, makes it less likely that an in-person informant is going to lie. *Id. Cf. United States v. Christmas,* 222 F.3d 141, 144 (4th Cir.2000) ("By informing the police about her neighbors' illegal activity, the [semi-anonymous] informant

exposed herself to the risk of reprisal. The fact that she provided the report to uniformed police officers in public only increased the probability that someone associated with the illegal activity would witness her aid to the police."), *cert. denied,* 531 U.S. 1098, 121 S.Ct. 830, 148 L.Ed.2d 712 (2001); *see also J.L.,* 529 U.S. at 276, 120 S.Ct. 1375 (Kennedy, J., concurring) ("An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a proportionate response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring.").

The hypothetical posed by Justice Kennedy in his concurring opinion in *J.L.* as possibly being outside the scope of the Court's holding was addressed shortly thereafter in a case decided by the District of Columbia Circuit. *See Thompson,* 234 F.3d at 727. In *Thompson,* two police officers were approached by an unknown individual who drove up to them in his car and stated that he "just saw" a man exit a car with a gun in a Wendy's parking lot, about 100 feet from where the officers were standing. *Id.* The man described the suspect's appearance and what he was wearing. *Id.* The officers did not question the man about the basis for his knowledge, nor did they request or obtain any personal information about the man himself. *Id.* They did, however, investigate the man's tip, and spotted a man who fit the description he gave. *Id.* Suspecting, on the basis of the unknown informant's tip, that the suspect was armed, the officer who spotted him first approached him with his weapon drawn. *Id.* Ultimately, the police stopped the suspect, frisked him, and found a loaded and cocked semiautomatic pistol. *Id.*

The district court had overruled the defendant's motion to suppress, but did so for reasons which the District of Columbia ***839** Circuit found were rejected in *J.L.,* which was decided after the district court had issued its ruling. *Id.* at 728. The appellate court stated that after *J.L.* it was not enough, as the district court had held, that an anonymous tipster's identifying information turns out to be accurate. *Id.* [FN18] Nevertheless, the appellate court held that the unknown informant's information was reliable for the reasons stated by Justice Kennedy in his *J.L.* concurrence, and for the same reasons stated in the other cases cited above. *Id.* at 729. [FN19]

> FN18. The Supreme Court stated in *J.L.* that to give rise to reasonable suspicion, a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." 529 U.S. at 272, 120 S.Ct. 1375. If it were otherwise, jaded individuals could easily use the police to harass their enemies by providing detailed descriptions of their whereabouts, appearance, and dress, and then adding that said persons are engaged in criminal activity. This is not enough. The police must be able to point to reliable accounts of criminal activity when relying on anonymous telephone tips, not mere descriptions of identity.

> FN19. The District of Columbia Circuit rejected without elaboration the criminal defendant's argument that an in-person informant is no more accountable for giving false information than an anonymous telephone tipster if the police do not bother to get the informant's identifying information. 234 F.3d at 729. In a similar scenario, the Second Circuit stated more honestly that "a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former *runs the greater risk* that he may be held accountable if his information proves false." *United States v. Salazar,* 945 F.2d 47, 50-51 (2d Cir.1991) (emphasis added), *cert. denied,* 504 U.S. 923, 112 S.Ct. 1975, 118 L.Ed.2d 574 (1992).

The Court has only found one case in which the Sixth Circuit considered, in a similar factual context, whether statements made by an in-person but otherwise unknown and unidentified informant could be considered by the police to develop a reasonable suspicion that the subject described by the informant was engaging in criminal conduct. In *United States v. Witherow,* police patrolling a high crime area were flagged down by a man who told them that "there was a man in a white car just like the patrol car, without the markings, who was trying to shoot the

informant's friend." 1996 WL 487457, at *1 (6th Cir. Aug.26, 1996). The unknown informant told the police that the suspect had a gun under his seat. *Id.*

The officers drove in the direction indicated by the informant, and after two blocks they saw a man in a white Ford that looked like their patrol car, which also was a Ford. They had not seen the car in the housing project before. It was parked illegally near a no-parking sign, in an area that the officers called "cocaine alley" because of the number of drug-related incidents they had witnessed there. As the officers pulled up behind the car, the officer in the passenger seat saw the man in the car reach over to the glove compartment. The officers stopped their car, got out, pulled their guns, and asked the man, Witherow, to step out of his car. Witherow stepped out, and upon request gave the officers his consent to search the car. One of the officers found a gun in the closed but unlocked glove compartment.

*Id.* Affirming the district court's judgment of conviction, the Sixth Circuit, as did the courts in the cases cited above, held that an in-person informant's tip that criminal activity is afoot is inherently more reliable than that of an anonymous telephone tipster. *Id.* at *3. Importantly, the court went on to hold that although the informant did not provide any predictive information, his statement that the suspect was trying to shoot his friend lent an air of immediacy to ***840*** the officers' decision making. *Id.* Moreover, the fact that the officers themselves observed the suspect parked illegally and did not recognize him or his car, in an area with which they were familiar, gave rise, under the totality of the circumstances, to reasonable suspicion of criminal activity. *Id.*

[22] It is oft stated that "reasonable suspicion," as with "probable cause," is a phrase which defies capture within one universally-applicable definition. In reviewing the actions of a police officer to see if he acted with "reasonable suspicion," the Court must consider the totality of the circumstances to see whether he had a particularized and objective basis for suspecting legal wrongdoing. See *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

In this case, in addition to the inherent seriousness of what the detainees told him, Sgt. Baker states that he broadcast the information about the possibility of there being weapons in the Plaintiffs' Suburban because: 1) he had already been forewarned by other officers to look out for weapons possession; 2) he was concerned for the safety of his fellow officers given the "reputation for violence and rioting" at past events at which the same musicians had performed; 3) he knew there had been weapons possession and drug arrests when the same musicians had performed at the Nutter Center in 1999; 4) he perceived the crowd as restless after the concert, owing to the failure of the headlining act to perform; 5) other fights had already broken out in and outside the arena; and 6) of the slow pace at which the Plaintiffs' Suburban was traveling as it passed Officers Mader and Coddie, who were detaining Dartagnan Hill, with their backs turned to the Suburban. (Baker Aff. ¶¶ 4- 14.) Sergeant Baker states that the Suburban's slow pace as it passed the other officers, coupled with the detainees' statements that there were weapons therein, evoked in him a fear that its occupants might have been planning to harm the officers as they detained and questioned Hill. (*Id.* ¶¶ 14 & 15.)

While a trier of fact might find some of these factors more relevant than others (*see, e.g., supra* note 16), the Court has no trouble finding that reasonable minds could not disagree that these factors, in their totality, gave rise to a reasonable suspicion that the Plaintiffs might have had weapons inside their Suburban. Indeed, based on the cases cited above, the information from the in-person informants was itself enough to justify Sgt. Baker's broadcast; the remainder of the factors merely serve to reinforce this fact.

[23][24] Even if the cases cited above could be distinguished and even if there were some doubt as to whether Sgt. Baker acted reasonably as a factual matter, the Court would still be obliged to grant him summary judgment on the basis of qualified immunity. In the interest of protecting public officers in the course of performing their discretionary duties from unduly onerous lawsuits under § 1983, the Supreme Court has recognized "qualified immunity" for such officers, "shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1986). Thus, in order for a public officer to be held accountable, the right she is charged with violating must be clearly established, and be one

of which a reasonable officer in her position would have known. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Furthermore, the "clearly established law" that forms the focal point of the Court's inquiry must be defined with particularity, *\*841* and not in the abstract. *See Anderson, supra,* at 639-40, 106 S.Ct. 2505. For instance, it is not enough to say that because the *general* right to due process as guaranteed by the Due Process Clause is clearly established, any *specific action* later found to be violative of the Due Process Clause is *per se* violative of a "clearly established" right. *See id.* at 639, 106 S.Ct. 2505. Rather, a court must more closely scrutinize "the contours" of the right allegedly violated; it must attempt to analyze the right allegedly violated in a particularized, less generalized, context, i.e., in light of the specific facts of the lawsuit under scrutiny. Thus, the relevant question is whether an officer could have reasonably believed that her actions were lawful, in light of the facts and the law as generally understood at the time of her action. *See id.* at 641, 106 S.Ct. 2505.

[25] Importantly, the *Anderson* Court held that even where the plaintiff's facts create a genuine issue as to whether a defendant police officer acted unreasonably, in light of the objective standard of the Fourth Amendment, that determination does not necessarily require leaving the final determination of reasonableness to the trier of fact, or mean that the officer's action could not in any respect have appeared appropriate and reasonable to a reasonable officer at the time. *Id.* at 643-44, 106 S.Ct. 2505. While reasonableness in the Fourth Amendment context will often be left to the trier of fact to determine if the facts are disputed, reasonableness in the qualified immunity context "ordinarily should be decided by the court long before trial." *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991). The distinction in the latter context is that the analysis turns on the legal issue of whether the law surrounding the particularly defined set of facts was "clearly established," such that no reasonable officer could have thought that her actions were reasonable. *See also Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (reaffirming that the Fourth Amendment reasonableness inquiry and the qualified immunity reasonableness inquiry are not the same).

In evaluating the contours of the constitutional right in question, the Court looks first to decisions of the Supreme Court, then to decisions of the Sixth Circuit and other courts within the circuit, and finally to decisions of other circuits. *See Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir.2001), *cert. denied,* 537 U.S. 817, 123 S.Ct. 86, 154 L.Ed.2d 22 (2002). It can hardly be argued, in light of the cases set forth above, including the Sixth Circuit's decision in *Witherow,* that the Plaintiffs in this case had a "clearly established" right to immunity from the suspicions of Sgt. Baker after he was informed by two detainees that they had weapons inside of their Suburban. [FN20] Even if the more reasonable thing to do would have been to interrogate the detainees quickly to discern whether their accusations were valid, and/or to obtain their identifications, and even if Sgt. Baker's action of reporting his suspicions to Officer Mader could be deemed, in hindsight, objectively unreasonable, the federal courts which have considered similar facts have not so concluded, at least not to the point that the cases form a cohesive and clearly defined right of citizens, of which a reasonable police officer *\*842* should have been aware. If anything, the holdings tend to favor Sgt. Baker's position, not the Plaintiffs. The Plaintiffs have not identified, and this Court has not found, *any case,* let alone a clearly settled body of cases, suggesting a contrary holding. For that reason, qualified immunity would have to be granted.

.      FN20. Because the actions of Officers Mader, Cyr, and Shuman were clearly reasonable, the Court need not consider the qualified immunity

   question with respect to them, though it goes without saying that they would be entitled to qualified immunity, given that the Plaintiffs cannot point to a clearly settled body of law demonstrating that their actions were unreasonable. *See Jones v. Marcum,* 197 F.Supp.2d 991, 1000 n. 6 (S.D.Ohio 2002).

Accordingly, with respect to the Plaintiffs' First Cause of Action, brought pursuant to 42 U.S.C. § 1983, there being no genuine issue of material fact, the Motions for Summary Judgment, of Cyr, Mader and Baker (Doc. # 26), and that of Officer Shuman (Doc. # 28), are SUSTAINED. [FN21]

FN21. The Plaintiffs have not set forth any evidence or argument on the merits of their First Cause of Action to the extent it is one under 42 U.S.C. § 1985 (conspiracy in violation of an individual's equal protection of the laws) or § 1988 (attorney's fees). Of course, a § 1988 claim is derivative, and cannot be maintained where a plaintiff does not prevail on an underlying § 1983 or § 1985 claim. Because, upon its own review of the facts, the Court finds no genuine issues giving rise to a viable § 1985 claim, and because the § 1983 claim is without merit, Defendants' respective Motions for Summary Judgment (Doc. # s 26 & 28) are SUSTAINED as to the Plaintiffs' First Cause of Action, to the

extent it is based on § 1985 and § 1988.

[26] Notwithstanding the Court's decision on the merits of the Plaintiffs' § 1983 cause of action, it is troubled by one argument proffered by Defendants Cyr, Mader and Baker in their Motion: that they were permitted to take into consideration the "fact" that the Nutter Center was a "high crime area" on the night of the concert. (Doc. # 26 at 14.) [FN22] This is flat wrong. Large arena music concerts, be they rap concerts, country music concerts, or rock concerts, attract thousands of people of all varieties of race, socioeconomic background, and temperament. Venues such as the Nutter Center play host to these concerts because they generally generate significant revenue. It is only natural that with large numbers of concert goers there come certain inherent risks, not the least of which are drug and excessive alcohol consumption, rowdiness, and even more deleterious criminal activity on the part of a small but visible number of those concert goers. These are the risks which the venue chooses to accept in exchange for hosting the revenue-generating event, and it is because of these risks that the venues enlist large security forces to help keep the peace, and that area police forces add overtime patrol units to the surrounding grounds.

FN22. At least this argument seems to be proffered only as a garden

variety legal argument, and not one based upon a factor expressed by any of the Defendants in their respective affidavits or depositions as one upon which they actually relied on the night in question.

Without a doubt, all of the parties to this litigation, Plaintiffs and Defendants alike, have indicated that they observed several altercations between the police and security forces on the one hand, and concert goers on the other, both in and outside the arena, and the Defendants stated that they had been forewarned of possible drug and weapons possession. However true any of this might be, it did not transform the Nutter Center into a high crime area, and the Court finds this comparison, made in reference to a *rap* concert, at which most or all of the performers were apparently black, [FN23] disturbing. There is no evidence that the concert at issue generated any more criminal activity than any other type of music concert, large sporting event, or even political demonstration. If it were truly the case, it is hard to imagine why the Nutter Center agreed to host the event in the first place. Of course, it is not ***843** the case. While the restlessness of the crowd and public safety in general were bona fide factors that the Defendants had to consider, this would be so at any concert, and the Court takes serious exception to the characterization that the Nutter Center and surrounding environs constituted a high crime area on the night in question.

FN23. Carnitta Vines stated in her deposition that she assumed all of the performers were black. (Carnitta Vines Depo. at 114.)

[27] With regard to the Plaintiffs' Second Cause of Action, the first question facing the Court is what the cause of action actually states. It reads:

26. Plaintiffs restate each and every allegation contained in Paragraphs 1 through 25 as if fully rewritten herein.

27. The stopping of Plaintiffs by Defendant Fairborn Police Officers was carried out in such fashion as to demonstrate a lack of conscious regard for Plaintiffs' rights to be free from unnecessary and unlawful threat of bodily harm or unlawful bodily harm so as to indicate racial profiling and lack of courtesy and respect for the African American adults and their children- without the due care and diligence which a prudent and reasonable individual would have displayed in such a stop and detention.

28. The actions of the Defendant police officers prior to and during the stop were carried out willfully, wantonly, maliciously, and with reckless disregard for the consequences.

29. Their actions were evidence of a reckless lack of conscious regard for the rights of the public, especially children of the ages of 9, 10, and 11 through teenagehood, and of the rights of a handicapped person (the driver Herbert Hines), and exhibits a lack of that degree of due care which prudent and reasonable individuals would show in executing the duties of police officers.

30. Plaintiffs sustained injuries.

31. The failures recited above demonstrate that the injury to Plaintiffs was proximately caused by the unlawful violence and reckless acts of the Defendants. Thus, under the laws of Ohio, the cause of action is thereby established to recover damages for the injuries and losses to Plaintiffs. The Court agrees with the argument proffered by Defendants Cyr, Mader and Baker that in these six paragraphs the Plaintiffs have failed to state a cause of action cognizable under the laws of Ohio or the United States. (Doc. # 26 at 16-17.) True, the terminology is suggestive of any number of causes of action recognized in the law, but at the summary judgment stage of litigation, the plaintiff must be able to articulate a more definite claim, because only then can the court recognize whether any genuine issues of material fact exist. Here, however, the Plaintiffs do not even attempt to clarify the gist of their Second Cause of Action in their Memorandum Contra (Doc. # 36). All they contend is that they *have* stated a cause of action. They do not elaborate, and merely state in conclusory fashion that 1) the Defendants were prejudiced against African Americans; 2) the Defendants did not prepare a use of force report on Dartagnan Hill, despite having detained him in handcuffs; and 3) the Defendants did not even make a record of the Plaintiffs' detention. (Doc. # 36 at 21.) None of these assertions is helpful in clarifying the nature of the Plaintiffs' claim: 1) there is no evidence that the Defendants acted with racial prejudice; 2) Dartagnan Hill is not a Plaintiff in this litigation so any actions taken as to him are irrelevant; and 3) however imperfect the conduct of Sgt. Baker and Officer Mader after the release of Plaintiffs might have been as a matter of police policy, such does not affect the reasonableness of the stop in the first instance or otherwise raise a constitutional question. The Plaintiffs completely fail to explain what they intended to state in paragraphs 26 through 31 of their Complaint. **844** What is more, they have not adduced any admissible facts to support their claim, even if one could be recognized in the pleadings.

[28] Giving them the benefit of the doubt, Defendants Cyr, Mader and Baker assume for the sake of argument that the Plaintiffs might have intended to state a racial profiling claim, and then argue that there is no evidence of such. (Doc. # 26 at 17.) Because the Plaintiffs do not respond to this argument, and, moreover, because there is no evidence that the officers acted with racially-biased motives on the night in question, the Court need not examine this area of the law. At most, there is a genuine issue of fact whether the officers used foul language, such as the phrases "get your ass on the ground," "get the fuck down," and "shut your asses up," in commanding the Plaintiffs to exit the vehicle and get on the ground. (*See, e.g.,* H.C. Hines Depo. at 89-90; Carnitta Vines Depo. at 106.) Disputed as they might be, these issues of fact are not material. While perhaps impolite, it can hardly be argued that the language allegedly used by the Defendant officers was unusual under the circumstances, let alone racially motivated. Simply put, there are no genuine issues of material fact with respect to the Second Cause of Action, which fails to state a claim under the laws of Ohio or the United States. With regard to it, the Motion for Summary Judgment of Defendants Cyr, Mader and Shuman is SUSTAINED.

[29] Officer Shuman, in his own Motion, does not address the Second Cause of Action. To some extent, this makes sense, seeing as the claim appears directed only at "Defendant Fairborn Police Officers" (Compl.¶ 27), which Officer Shuman is not. Nevertheless, prior pleadings are

incorporated therein (Compl.¶ 26), and it is therefore possible that the Plaintiffs intended to name him as well. The Court has already pointed out, of course, that it is unable to imagine any set of facts pursuant to which the Plaintiffs would be entitled to relief on their Second Cause of Action. Be that as it may, the Court cannot grant summary judgment on a claim if a defending party does not move for such. Accordingly, Officer Shuman is directed to file, within ten days from date, a supplemental motion for summary judgment with respect to said cause of action. The Plaintiffs may then reply, in accordance with S.D. Rule Civ. P. 7.2(a)(2), though they should take note that nothing in any response they may submit shall be used by the Court to reconsider its decision with respect to Defendants Cyr, Mader and Baker.

[30] The Plaintiffs' Third Cause of Action is merely a restatement of its First Cause of Action. Though they do not invoke § 1983 by name, they use § 1983 liability language, and invoke the Fourth and Fourteenth Amendments as the substantive guarantees of their rights. (*See* Compl. ¶¶ 33 & 34.) That this is a redundant claim is reiterated in their Memorandum Contra to the Motion of Defendants Cyr, Mader and Baker, where they note that their Third Cause of Action is one for violations of due process and unlawful search and seizure. (Doc. # 36 at 22.) Defendants Cyr, Mader and Baker argue that summary judgment should be granted as to this claim for the same reasons stated as to the § 1983 action. The Court agrees. However, again being charitable, these Defendants further assume, for the sake of argument, that the Plaintiffs might have intended to incorporate a claim for common law assault into their Third Cause of Action. (*See* Compl. ¶ 35.) Because the parties raise the issue, the Court will address it. (*See* Doc. # 26 at 18-20; Doc. # 36 at 22-25.)

[31] The tort of assault is "the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such ***845*** contact." *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 614 N.E.2d 1148, 1154 (1993). No doubt in some other context, where individuals come upon other individuals in their car and order them out and to the ground at gunpoint, such would constitute assault, but this is not that context. Ohio Rev.Code § 2744.03 provides employees of political subdivisions with immunity from tort liability, subject to three exceptions, one being where the "employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner...." Ohio Rev.Code § 2744.03(A)(6)(b). Given that the Court has already found that the Defendants' actions were reasonable, it would be impossible to infer that they might nevertheless have been malicious or reckless and the like. [FN24]

> FN24. The other exceptions to statutory immunity are where the officer's acts were manifestly outside the scope of his employment and where liability is imposed by some other statute of the Ohio Revised Code. Ohio Rev.Code § 2744.03(A)(6)(a) & (c). The Plaintiffs have not adduced any evidence or reasonable arguments demonstrating that these exceptions to immunity are applicable.


For his part, Officer Shuman has simply made a single argument as to each cognizable issue raised throughout the First and Third Causes of Action, to which the Plaintiffs have responded in kind. The arguments are applicable to both claims. Because the Court has nothing more to consider under the Third Cause of Action than it has already considered under the First Cause of Action, it will SUSTAIN the respective Motions for Summary Judgment of Defendants Cyr, Mader and Baker (Doc. # 26) and Defendant Shuman (Doc. # 28), for the reasons already stated with regard to its analysis of the Plaintiffs' First Cause of Action.

B. *Motion for Summary Judgment of Defendant Haymon (Doc. # 25)*

As noted, Haymon produced and promoted the concert, leased the Nutter Center for the performance, and, in so doing, agreed to indemnify the Nutter Center for any negligence on its behalf. He also agreed to be "solely responsible" for the safety of, among others, the "attending public." It is on the basis of these provisions of the Lease Agreement that he has been named as a Defendant in this suit. (*See* Pls.' Memo. Contra Def. Haymon's Mot. S.J. (Doc. # 38) at 12.) To the extent the Plaintiffs invoke the indemnity clause of the Lease Agreement, their action must fail because neither WSU nor the Nutter Center, to the extent it has a separate legal identity, is a

Defendant in this case. To the extent the Plaintiffs invoke the "solely responsible" provision, under various theories of liability, such as *respondeat superior,* negligent hiring and training, and intentional infliction of emotional distress (*see* Doc. # 38 at 13-15), the action must fail for the reasons stated with respect to the other Defendants: as there is no basis for holding the Defendant police officers liable, there is no reason for holding Haymon liable, and there is, furthermore, no evidence that Haymon himself, or anyone for whom he was legally responsible, acted negligently, let alone extremely reckless and outrageously, toward the Plaintiffs. Moreover, it is a highly dubious proposition that a private entity can be held liable, under the common law of Ohio, for the actions of sworn, government police officers, acting within the scope of their official duties, and he certainly cannot be held liable under § 1983.

The Plaintiffs ask "what is the point" of the "solely responsible" provision of the Lease Agreement if not to make Haymon responsible for the public's well being? (Doc. # 36 at 12.) The answer to their question is that such *is* the purpose. The ***846** problem is that they have not adduced any facts which might trigger such a liability. Though the Court need not elaborate on the question because no acts of negligence have been shown, the uncontested facts demonstrate conclusively that Defendant officers were acting in their official capacities. Haymon was in no manner responsible for the actions of sworn police officers patrolling the grounds outside the Nutter Center, and the Court rejects the Plaintiffs' unsupported arguments to the contrary. (*See* Doc. # 38 at 12-15.) While a government police officer may no doubt moonlight as a private security guard (*see, e.g.,* Barlow Depo. at 23 (noting that an Officer Hicks was working in a private security capacity at the Red Roof Inn, across the street from the Nutter Center)), that was not the case with any of the Defendant officers named herein. (*See id.* at 86.) Furthermore, it was the Nutter Center, not Haymon, which was responsible for providing security, and even at that the Lease Agreement only called for "building security." In this case, the private security company, Ohio Entertainment, bore the responsibility of securing the inside of the Nutter Center. (*Id.* at 22; Lease Agreement ¶ 4.)

[32] In sum, Haymon was incapable, as a legal matter, of hiring and employing police officers serving in their official capacities; he was not, in any event, even responsible for employing the Nutter Center security; and neither the Nutter Center nor any individual private security officers has been named as a Defendant. Thus, Haymon cannot be held liable under either the indemnity provision or the "solely responsible" provision of the Lease Agreement, even if the Plaintiffs could otherwise show that they, as members of the "attending public," were harmed by any such police officers or private security personnel (which they have not).

Accordingly, there being no genuine issue of material fact, Haymon's Motion for Summary Judgment (Doc. # 25) is SUSTAINED.

C. *Other Pending Motions*

In addition to the Motions discussed above, also pending before the Court are Plaintiffs' Motion for Leave to Amend Complaint (Doc. # 32), Plaintiffs' Motion to Strike Defendant Shuman's Expert Witness Affidavit and Report (Doc. # 50), Defendants' Motions to Strike Expert Witness Reports and Prevent Plaintiffs' Witnesses from Testifying at Trial (Doc. # s 53 & 57) and Plaintiffs' Motions to Strike Defendants' Motions to Strike (Doc. # s 58 & 59). These are all now moot, and are therefore OVERRULED. [FN25]

> FN25. The Court has not considered the Plaintiffs' expert witness reports in ruling on the Defendants' Motions for Summary Judgment. Their experts, Wayne Amerson and Tim Dimoff, opine mostly on the legality of the Defendants' conduct on March 1, 2000. (*See* Doc. # 36 at Exs. 2 & 3.) Such opinions are the bailiwick of the Court.

The Court will note for the record that the Plaintiffs' Motion for Leave to Amend Complaint (Doc. # 32) concerns their desire to substitue Officer Mark Stannard and Sgt. Terry Barlow as Defendants in place of previously named John Does. The Court understands that both of these individuals were with the Fairborn Police Department at the time of the events in question. (*See* Barlow Depo. at 5, 25.) Aside from the substitution of names, no further changes, such as the addition of new and additional allegations, are contemplated. As characterized in the Complaint,

the participation of the John Does in the detention of the Plaintiffs was no greater than that of any of the named Defendants. Given that summary judgment is warranted as to every other Defendant, adding new names to the Complaint would be an empty exercise.

**847* IV. *Conclusion*

For the reasons and citations of authority set forth above, this Court sustains the Motion for Summary Judgment of Defendant Al Haymon (Doc. # 25), sustains the Motion for Summary Judgment of Defendants Officer Lee Cyr, Officer G.R. Mader and Sgt. Greg Baker (Doc. # 26) and sustains the Motion for Summary Judgment of Defendant Officer Daniel Shuman (Doc. # 28). Because he failed to address the Plaintiffs' Second Cause of Action, Officer Shuman is directed to file, within 10 days from date, a supplemental motion for summary judgment with respect thereto. The Plaintiffs may reply, in accordance with S.D. Rule Civ. P. 7.2(a)(2), though they should keep in mind that nothing in any response they do happen to submit shall be used by the Court to reconsider its decision with respect to Defendants Cyr, Mader and Baker. Furthermore, the Court overrules, as moot, the Plaintiffs' Motion for Leave to Amend Complaint (Doc. # 32), the Plaintiffs' Motion to Strike Defendant Shuman's Expert Witness Affidavit and Report (Doc. # 50), the Defendants' Motions to Strike Expert Witness Reports and Prevent Plaintiffs' Witnesses from Testifying at Trial (Doc. # s 53 & 57) and the Plaintiffs' Motions to Strike the Defendants' Motions to Strike (Doc. # s 58 & 59).

Should this case remain viable following the Court's ruling on Defendant Shuman's supplemental motion for summary judgment with respect to the Plaintiffs' Second Cause of Action, a scheduling conference will be convened to set a new trial date and other dates leading to a resolution of this litigation.

This is not a final appealable order.

S.D.Ohio,2003.

Alexander v. Haymon

254 F.Supp.2d 820

END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.