UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
CASE NO. 1:02cv00387-WOB

PAULETTTA L. LAVENDER, ET AL                                     PLAINTIFFS

VS.                              **OPINION AND ORDER**

CITY OF BLUE ASH, ET AL                                          DEFENDANTS

On November 15, 2004, oral argument was held on defendants' motions for summary judgment (Doc. #13 and #14). Plaintiff was represented by Tamara Parker; defendants City of Blue Ash and Officer Weldon Julien were represented by Amanda Prebble; defendants City of Montgomery, Officer Thomas Wagner and Officer Ronald Fread were represented by Boyd Gentry and Terrence Donnellon. Official court reporter Joan Averdick recorded the proceedings.

In ruling on these motions, the court has considered the depositions in the record and also tapes of the police radio transmissions and videos from two cruiser cameras. The audio and videotapes were introduced through the affidavit of Captain John H. Pohlman.

**FACTS**

On February 21, 2002, an armed robbery occurred at the Firstar Bank, located on Montgomery Road in Norwood, Ohio. The Norwood Police Department issued a bulletin describing the robbery suspect as a white male, in his 30's, about 5'5" tall, weighing approximately 145 pounds and wearing a baseball hat. The getaway vehicle was described as an "older police cruiser type vehicle" with front-end damage and no front bumper. The bulletin also read that there was an additional person in the getaway vehicle, but did not give a description of that person.

1

Approximately one hour later, the Norwood Police Department issued another bulletin stating that the suspected bank robber left the scene in a white "older beaten-up police cruiser type auto" with a white "police type spotlight on the driver's side."

Officer Julien, a member of the City of Blue Ash Police Department, was in his cruiser patrolling for traffic violations when he heard the all-county bulletin. Within approximately forty-five minutes of hearing the bulletin, Officer Julien saw plaintiffs' car pass his cruiser.[1] Officer Julien testified that he did not recall the description of the suspect, but recalled the description of the car. Finding the car was similar to the one described in the bulletin, Julien began following plaintiffs' car, radioed for backup and stopped the car. When Officer Julien pulled plaintiffs' car over, he was parked directly behind plaintiffs. Officer Julien testified that at no time prior to stopping the plaintiffs' car had he seen the front of plaintiffs' vehicle.

Officer Wagner of the City of Montgomery Police Department responded to Officer Julien's request for backup. He testified that plaintiffs' vehicle, as officer Julien described it, matched the description of the vehicle used in a robbery earlier in the day. Officer Wagner and other officers arrived at the scene. Officer Wagner stated that, although he could see individuals moving around inside the car, he could not identify anyone or determine what they were doing because the windows were tinted.[2]

---

[1] Officer Julien testified that he was stopped in the direction of traffic and was watching in his rearview mirror for suspected speeders. He noticed plaintiffs' vehicle as it passed his cruiser and noted that it appeared to fit the description of the vehicle used in the robbery.

[2] The defendants all argue that the officers could not see the occupants of the car because the windows were tinted. In fact, one officer can be heard on the radio stating that the windows are tinted. Plaintiffs contend that the windows are not tinted and submit a picture of the car as evidence that the windows are not tinted. The picture, however, shows the windshield and the view out the side windows from inside the car. The plaintiffs did not submit a picture depicting

Officer Julien, using his speaker, ordered the driver to turn off the car, place the keys outside the window, open the door and step outside. Officer Julien testified that when the driver stepped out of her car, that was the first time he knew her race or sex. Officer Julien then instructed the driver to walk backwards with her hands behind her head. During this time, Officer Julien had his gun pointed at plaintiff Lavender, the driver, and in the general direction of her car. Captain Pohlman asked Officer Wagner to place plaintiff Lavender in handcuffs. The officers then removed the minors from the car.

Once the plaintiffs were removed from the car, officers began searching the vehicle for weapons and to insure no one was hiding in the trunk. Officer Julien also searched plaintiff Lavender's purse and removed her insurance identification card.

Sergeant Fread of the City of Montgomery Police Department arrived on the scene. As he turned the corner, he saw the minor children and returned to his vehicle to get a better description of the bank robber and the car involved. He learned that the stopped vehicle did not fully match the description of the suspect vehicle and that the occupants did not match the description of the suspect. Sergeant Fread walked over to where plaintiffs were being held and told the officers the vehicle did not match the description of the suspect vehicle. He then directed Officer Wagner to remove the handcuffs. Sergeant Fread explained to plaintiff Lavender that she was pulled over because her car fit the general description of a vehicle used in a bank robbery. He then asked that she move her vehicle around the corner so that the officers could talk with her. Officer Fread testified that he asked her to move her car so that the traffic problems, caused by the stop, could be cleared.

---

the side windows from an exterior view. It is also unclear from the video whether the windows were tinted. In the video, persons can be seen in the car, but their sex, race and age cannot be ascertained.

Two police cruisers' cameras captured the stop. The videotape and other evidence illustrate the following time line[3]:

| | |
|---|---|
| 12:40 to 12:42 | Robbery at Firstar Bank in Norwood |
| 12:40-12:47 | First bulletin issued |
| unknown | Second bulletin issued |
| unknown | Officer Julien sees Plaintiffs' car and believes it meets the description of the get away car, he follows the plaintiffs and calls for backup. |
| 1:08 | Plaintiffs' vehicle pulled over (time captured on camera behind plaintiffs' car)   (1:02 is time captured on camera in front of plaintiffs' car) |
| 1:09 | Plaintiff Lavender ordered out of car at gunpoint. (1:03 on front camera)  Appears plaintiff placed in handcuffs. (1:04 on front camera) |
| 1:10 | Plaintiff children removed from car at gunpoint. |
| 1:12 to 1:15 | Officers search car - trunk opened at 1:13 |
| unknown | Officer Fread arrives and calls for additional information on suspect and vehicle.  Fread obtains information that suspect vehicle does not have bumper.  Plaintiffs' car has bumper.  Officer Fread orders handcuffs removed and asks Ms. Lavender to move car around corner so Officer Julien can talk with her further.<br>-Officer heard on radio stating ok to start moving traffic (1:08 on front camera) |
| 1:15 | Traffic starts moving<br>- Officer with front video equipment leaves scene and camera turned off (1:08 on front camera).  Camera was turned on a total of 6 minutes. |
| 1:16 | Plaintiffs return to car and get in. |

1:16 camera turned off.  Camera was turned on a total of 8 minutes.

The total time Mrs. Lavender was out of her car was eight minutes. The total duration of the entire stop lasted about twenty minutes. (Julien Aff. ¶ 21).  Officer Wagner testified that he estimated plaintiff Lavender was in handcuffs for approximately four (4) minutes. (Wagner Depo. p. 74).

---

[3]The parties agreed, during the oral argument, that they had no objection to the court's time line.

## ANALYSIS

Plaintiffs concede that Officer Fread is entitled to summary judgment on all claims. They proceed against the remaining defendants on their claims under § 1983, false arrest and intentional infliction of emotional distress.

**A. The Officers Are Entitled to Qualified Immunity**.

It is well established that "Government officials are generally entitled to qualified immunity when performing discretionary functions as long as the conduct `does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Sandul v. Larion, 119 F.3d 1250 (6th Cir. 1997) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "In order to assert a violation of a `clearly established' right and defeat a qualified immunity defense, `the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 1254 (quoting Anderson v. Creighton, 483 U.S. 635 (1987)). The Sixth Circuit has adopted an objective reasonableness test to determine whether an officer would believe that a right is clearly established. Id. "The objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law." Id. (quoting Long v. Norris, 929 F.2d 1111 (6th Cir.), cert. denied, 502 U.S. 863 (1991)).

In analyzing a motion seeking to assert qualified immunity, the court must first determine if the plaintiffs' rights were violated at all, then, if so, whether it was clear to the officers that what they did violated plaintiffs' clearly established rights considering all the facts and circumstances. Hoover v. Radabaugh, 307 F.3d 460, 465 (6th Cir. 2002).

      1.  <u>The Stop did not Violate Plaintiffs' Constitutional Rights.</u>

The plaintiffs allege that the police officers violated their Fourth and Fourteenth Amendment rights against unreasonable searches and seizures and equal protection under the laws. (Complaint ¶ 23). The conduct complained of, however, does not rise to the level of a constitutional violation.

Plaintiffs allege the officers did not have a reasonable and articulable basis for stopping their vehicle, ordering them out of the car with guns drawn and handcuffing plaintiff Lavender because their car did not meet the description of the suspect vehicle nor did any of them match the description of the suspect. Plaintiffs state that the officers could have quickly determined that the vehicle did not match the description of the suspect vehicle by conducting a cursory check of the front-end of the car. The suspect car reportedly had front-end damage and no bumper. Plaintiffs' vehicle had no damage to the front-end. The plaintiffs also state that the officers should have known that they had the wrong vehicle as soon as plaintiff Lavender exited the vehicle and the officers saw that the occupants were all African-American females and that there was no white male in the car.

The Sixth Circuit has held that "[p]olice may briefly stop an individual for investigation if they have a 'reasonable suspicion' that the individual has committed a crime." <u>Houston v Clark County Sheriff Deputy John Does 1-5</u>, 174 F.3d 809, 813 (6th Cir. 1999) (quoting <u>United States v. Palomino</u>, 100 F.3d 446, 449 (6th Cir. 1996)). The "reasonable suspicion" test also applies to vehicle stops. <u>Id.</u> <u>See also United States v. Jacob</u>, 377 F.3d 573, 577 (6th Cir. 2004). "'Reasonable suspicion' is more than an ill-defined hunch; it must be based upon 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" <u>Id</u>. "It requires 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' an investigatory stop." <u>Id</u>. (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968)).

Houston is very similar to the facts alleged in the case at bar. Houston v Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 813 (6th Cir. 1999). There, two officers responded to a call for a theft at a bar. Id. at 811. As the bar was closing, several fights broke out and a security guard was assaulted. Id. at 812. One of the officers heard the commotion, saw the guard was bleeding profusely from the head and believed the guard had been shot. Id. The officer saw someone getting into a car nearby and speed off. Id. The officer suspected that the individual was the person that shot the guard. Id. He called for assistance and another officer soon joined in the pursuit. Id. The first officer was unable to identify the suspect's car but radioed the number of cars between the police car and the suspect. Id. The responding officer misunderstood the car-counting method and pulled over the wrong car. Id. The officers, with guns drawn, ordered the driver to throw out the keys and get out of the car. Id. The driver and passenger were then handcuffed and placed in the cruiser. Id. The officers searched the cars and found no weapons. During the search, the officers learned the guard had not been shot, but had been hit with a bottle. The officers, believing these individuals may have been involved in the assault, continued to question and detain the individuals for up to an hour. Id. After the officers failed to discover any information tying the occupants to the assault, they allowed them to leave. Id.

The occupants of the car brought a § 1983 action against the officers for the alleged violation of their Fourth Amendment rights. The Sixth Circuit held that under the totality of the circumstances the officers possessed a reasonable, although mistaken, suspicion that the occupants of this car were involved in the assault at the bar. Id. at 813. Thus, despite the unfortunate consequences to the individuals, the mistaken stop itself was not of a constitutional dimension. Id.

The court also found that, when officers reasonably fear that the suspects are armed and

dangerous, they may order the suspects out of a car with their weapons drawn when it is necessary for the protection of the officers. Id. at 814. See also United States v. Jacob, 377 F.3d 573, 577 (6th Cir. 2004) (ordering defendants out of vehicle and use of handcuff reasonable, as concern for the officers' safety was at its height). Furthermore, the court stated that the use of handcuffs does not exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution. Id. See also United States v. Walker, 1995 WL 141343, **5-6 (6th Cir.), cert. denied, 515 U.S. 1150 (1995) (law permits use of guns and handcuffs to effect a Terry stop when reasonable under circumstances). The Sixth Circuit found the officers' use of handcuffs and the suspects' detention in the police car was reasonable in light of the facts known to the officers at the time of the stop. Id. Therefore, there was no Fourth Amendment violation.

Similarly, in the case at bar, the totality of the circumstances demonstrate the officers acted on a reasonable belief that plaintiffs' car had been involved in an armed robbery earlier that day. First, Officer Julien spotted a car matching the description of a car used earlier in the day during a bank robbery: a white, old, boxy vehicle with a spotlight on the driver's side that looked similar to an old police cruiser. The spotlight on the driver's side is not common on vehicles. (Wagner depo. p. 52). Officer Julien followed plaintiffs and called for backup. The officers responding to Officer Julien's call for backup had a reasonable basis for assisting based upon the information provided by Julien in his call. Plaintiffs argue that the backup officers should have sought further information before assisting Officer Julien. This argument, however, does not take into account the realities of police work. As the Houston court noted:

> [p]olice officers are regularly forced to make critical decisions under extreme pressure. Had [the officer] conducted a more prolonged investigation . . . the most promising lead in the investigation of a serous felony could have quickly evaporated.

Houston, 174 F.3d at 813-14.

      Once sufficient backup was in place, Officer Julien initiated the stop. Believing the occupants of the vehicle may have been involved in an armed robbery earlier that day, the officers had their guns drawn when Officer Julien ordered the driver out of the car. After plaintiff Lavender exited the car, she was ordered to walk toward Officer Julien with her hands on her head. Once she reached him, an officer handcuffed her to secure the scene. The other occupants were then also removed from the vehicle. Officer Julien and two other officers searched the car. Officer Julien testified that he felt it was necessary to search the car to insure no one was hiding in the trunk and that no weapons were present.

      As the car was being searched, Officer Fread came upon the scene. Fread testified that, after finding the scene secure, he called dispatch to obtain a detailed description of the vehicle and suspect. Officer Fread soon learned that the stopped vehicle did not fully match the description of the suspect vehicle and that none of the plaintiffs matched the description of the suspect. Officer Fread immediately relayed the information and ordered an officer to remove the handcuffs. Fread explained to plaintiff Lavender that they were pulled over because her car matched that of a vehicle used in an armed robbery early in the day. He then asked that she move her vehicle around the corner so the officers could talk to her.

      The audio and video tapes demonstrate the sense of urgency the officers felt as they prepared to stop the plaintiffs' vehicle. It is evident that Officer Julien believed plaintiffs' vehicle matched the description of the car used in the armed robbery earlier in the day. The responding officers acted reasonably based upon the information they received from Officer Julien in his request for backup. Viewing the totality of the circumstances, at the time of the stop, the officers reasonably

9

believed that plaintiffs' vehicle had been used as a getaway car in an armed robbery which occurred earlier in the day.

Plaintiffs further argue that the detention continued even after the officers should have known that the plaintiffs did not match the description of the suspects. Plaintiffs cite State v. Robinette, 80 Ohio St. 3d 234 (1997), for the proposition that once an officer's justification to detain an individual has been addressed, there can be no constitutional reason to continue to detain them without their consent. Plaintiffs argue that the officers should have ceased the detention once plaintiff Lavender stepped out of the car and the officers saw she was a black female, not a white male.

In Robinette, the officer pulled over a vehicle for speeding. After giving the driver a warning for speeding, he asked if the driver was carrying any illegal contraband in his car. When the driver replied that he was not, the officer asked if he could search his automobile. The court found that the officer was not justified in detaining the driver to ask for and execute an intrusive search because he did not have any reasonably articulable facts or individualized suspicion to justify the detention.

In the case at bar, however, the officers testified that they secured the scene after they saw plaintiffs were not white males because they could not be sure the vehicle had not been used in the robbery or that the robber was not hiding in the vehicle. The videotape illustrates the officers' believed there was a real possibility someone was hiding in the trunk. The officers approached the trunk with guns pointed, they cautiously unlocked it and slowly lifted the hood. The entire time, the officers kept their bodies out of the line of fire and had their guns pointed down at the trunk. In addition, the officers knew the robbery suspect had left the scene with another individual, but they

did not have a description of the accomplice.  These facts do provide the officers with a reasonable basis for detaining plaintiffs while the car was searched.  United States v. Jacob, 377 F.3d 573, 579 (6th Cir. 2004) (officers entitled to rely on experience and training that weapons used in certain types of crimes).  Here, it was reasonable for the defendants to secure the area while they quickly confirmed or dispelled their suspicions that an armed robber was in the vehicle.

As recently noted by the Sixth Circuit:

> In Adams v. Williams, 407 U.S. 143, 92 S. Ct. 1921, 32 L .Ed 2d 612 (1972), the [Supreme] Court emphasized the duties of a suspicious officer:
>> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, Terry recognizes that it may be the essence of good police work to adopt an intermediate response. . . .  A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.  Adams, 407 U.S. at 145-46.

Watkins v. Southfield, 221 F.3d 883, 888 (6th Cir. 2000).

The Sixth Circuit has further observed:

> The permissible purposes of a Terry stop include determining the detainee's identity, Adams v. Williams, 407 U.S. [143, 146 (1972)], maintaining the status quo temporarily, id., asking the detainee to explain the suspicious circumstances, United States v. Brignoni-Ponce, 422 U.S. [873, 881-82 (1972)], and general investigation and interrogation, United States v. Oates, 560 F.2d [45, 57 & 59 (2nd Cir. 1977)].

United States v. Smith, 574 F.2d 882, 886, n. 15 (6th Cir. 1978) (emphasis added).

Plaintiffs also allege that the officers violated their Fourteenth Amendment rights because they were treated differently because they were black than they would have been if they had been white.  Specifically, plaintiffs state: "It is [our] contention that had this been a white female from Hyde Park or Indian Hill with their two daughters in the automobile that there would not have [been] guns pointed at them.  The mother would not have been handcuffed with her hands behind her back,

11

and then been subjected to having items stolen from her purse; made to stay in custody-even after [they] were told that not only [did they] have the wrong automobile but also the wrong individuals."

The equal protection clause contained in the Fourteenth Amendment protects persons from the selective and discriminatory enforcement of laws. To establish a claim for selective enforcement, a plaintiff must establish: 1) the official singled out a person belonging to an identifiable group for prosecution even though he had decided not to prosecute persons not belonging to that group in similar situations; 2) the initiation of the prosecution was with a discriminatory purpose; and 3) the prosecution had a discriminatory effect on the group to which the person belongs. United States v. Anderson, 923 F.2d 450, 453 (6th Cir.), cert. denied, 499 U.S. 980, and cert denied, 500 U.S. 936 (1991).

Plaintiffs have not presented any evidence to establish that Officer Julien initiated the stop because of plaintiffs' race. Instead, the evidence demonstrates he initiated the stop because the plaintiffs' vehicle matched the description of a vehicle used in an armed robbery. Officer Julien testified he did not know the plaintiffs' race until they stepped out of the car. Furthermore, plaintiffs have not presented any evidence that the plaintiffs were singled out because of their race, that the stop was initiated for a discriminatory purpose or that it had a discriminatory effect on her race as a group. Accordingly, defendants are entitled to summary judgment on plaintiffs' claim that defendants violated their rights under the Equal Protection Clause of the Fourteenth Amendment.

2. Even if Plaintiffs' Constitutional Rights had been violated, the Officers are still Entitled to Qualified Immunity.

Under the second prong of the qualified immunity test, if the court finds a constitutional violation occurred, the issue is whether the violation involved "clearly established statutory or constitutional rights of which a reasonable person would have known." Sandul v. Larion, 119 F.3d

1250 (6th Cir. 1997)(quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  Here, the only right even remotely alleged is a violation of plaintiffs' rights under the Fourth Amendment.  As stated above, "In order to assert a violation of a 'clearly established' right and defeat a qualified immunity defense, `the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  <u>Id</u>. at 1254 (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635 (1987)).  The Sixth Circuit has adopted an objective reasonableness test to determine whether an officer would believe that a right is clearly established.  <u>Id.</u>  "The objective reasonableness test focuses on whether an official, given the facts that the official knew or reasonably should have known about the situation, should have known that his or her particular conduct would not pass scrutiny when applied to the law."  <u>Id</u>.  (quoting <u>Long v. Norris</u>, 929 F.2d 1111 (6th Cir.) <u>cert. denied</u>, 502 U.S. 863 (1991)).

  Here, the officer knew that an armed robbery had occurred in the area and observed a vehicle matching the description of the getaway vehicle.   The vehicle contained a feature, a spot light on the hood on the driver's side, which the officer believed was somewhat unique.  The law is well defined that an officer may make a <u>Terry</u> stop to investigate when he has a reasonable suspicion that an individual has committed a crime.  <u>Houston</u>, 174 F.3d at 813.  Here, Officer Julien held a good faith belief, albeit a wrong one, that plaintiffs' vehicle had been involved in a robbery.  An officer, knowing the information known to Officer Julien at the time he decided to make the stop, would not have believed stopping this vehicle would amount to an unlawful act.

  Furthermore, as to Officer Wagner, an officer responding to a call for backup in stopping a vehicle suspected of being involved in an armed robbery, would believe that assisting that officer in making the stop would  be a lawful act.  Officers are entitled to formulate reasonable suspicion

to effect an stop based upon information they receive from fellow officers.  See Houston, 174 F.3d at 814 (citing McPherson v. Kelsey, 125 F.3d 989, 993-94 (6th Cir. 1997)).

The totality of the circumstances demonstrate that even if plaintiffs' Fourth Amendment right to be free from unreasonable searches and seizures was violated, the officers' actions were objectively reasonable in light of the information known to them at the time.  Therefore, the officers are entitled to qualified immunity.

**B.  Both Municipalities are Entitled to Summary Judgment.**

Municipalities can be held liable under § 1983.  Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978).  The statute does not, however, impose liability on a municipality for the constitutional torts of its employees and, therefore, a municipality cannot be held liable under § 1983 on either a respondeat superior or vicarious liability theory.  Id. at 691.  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Id. at 694.

Therefore, to make a case against a municipality under § 1983, the plaintiff must: 1) identify the municipal policy or custom involved; 2) connect the policy to the municipality, and 3) demonstrate that his injury was incurred as a result of the execution of the policy.  Alkive v. Irving, 330 F.3d 802, 814 (6th Cir. 2003).

Here, plaintiffs have not identified a municipal policy or custom of either the City of Blue Ash or the City of Montgomery that was involved in this matter.  The only facts even alleged for their liability is that they employ the respective officers involved.  As a municipality cannot be held liable under § 1983 on either a respondeat superior or vicarious liability theory, both cities are

entitled to summary judgment on this claim.  Monell, 436 U.S. at 694.

Similarly, under Ohio law, a political subdivision is immune from liability for damages in a civil action for injury, death, or loss to person or property caused by any act or omission of an employee in connection with a governmental or proprietary function.  Ohio Rev. Code § 2744.02. The statute identifies exceptions to this immunity.  There are no exceptions to immunity, however, for the tort of intentional infliction of emotional distress.  See Wilson v. Stark County Department of Human Services, 70 Ohio St. 3d 450, 452 (1994).  Therefore, since a city falls within the definition of "political subdivision,"[4] both defendant cities are entitled to immunity and cannot be held liable for intentional infliction of emotional distress.  Id.

For the above stated reasons, both the City of Montgomery and the City of Blue Ash are entitled to summary judgment.

**C.  The Officers are entitled to Summary Judgment on the State Law Claims.**

Plaintiffs allege that Officers Julien and Wagner are liable for false arrest and intentional infliction of emotional distress (IIED).  The defendant officers, however, are entitled to immunity on both these state law claims.  Ohio Rev. Code § 2744.03.

Ohio Revised Code § 2744.03(A)(6) proves immunity for employees of a political subdivision unless certain facts exist.  Ohio Revised Code § 2744.03(A)(6) states, in part:

> (6) . . . the employee is immune from liability unless one of the following applies:
> (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

---

[4]"Political subdivision" or "subdivision" means a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state.  Ohio Rev. Code § 2744.01(F).

c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

Only the second exception is relevant to the case at bar. Plaintiffs have not set forth any evidence to establish that the officers acted with malicious purpose, in bad faith, or in a wanton or reckless manner. "Malicious purpose" requires the willful and intentional design to do injury or the intention to harm another, usually seriously, through conduct with is unlawful or unjustified. Cook v. Cincinnati, 103 Ohio App. 3d 80, 90-91 (1995). "Bad faith" involves a dishonest purpose, conscious wrongdoing or actual intent to deceive. Id. "Reckless or Wanton misconduct" is the intentional deviation from a clear duty or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. Id.

Plaintiffs have not presented any evidence to establish that the officers acted in a manner mounting to malicious purpose, bad faith, wanton misconduct or recklessness. As discussed above, the evidence established the officers acted pursuant to a reasonable belief that the vehicle was involved in an armed robbery and, therefore, its occupants may be armed and dangerous. Once it was confirmed the plaintiffs and their vehicle did not match the description of the suspect or suspect vehicle, they were released. See Lee v. Cleveland, 151 Ohio App. 3d 581 (Cuyahoga County 2003) (officers entitled to immunity for action based on excessive force in investigating armed robbery suspects).

The plaintiffs have failed to present evidence demonstrating that an exception to employee immunity exists. Accordingly, the defendant officers are entitled to immunity of the state tort clams of IIED and false arrest.

Furthermore, as discussed above, the stop did not ripen into an arrest. The Houston court stated: "Although there is no bright line that distinguishes an investigative stop from a *de facto*

arrest. . . . the length and manner of an investigative stop should be reasonably related to the basis for the initial intrusion." Id at 814.  In this case, the officers made a stop, drew and aimed their weapons and handcuffed plaintiff Lavender based upon the reasonable belief that the car and possibly its occupants had been involved in an armed robbery.  The officers were entitled to rely on their training and experience in concluding that weapons are used in armed robberies and, therefore, the situation could be dangerous.  Further, the only evidence before the court is that plaintiff Lavender was in handcuffs for approximately four (4) minutes, that the plaintiffs were out of their car for 8 minutes, and that the total stop took 20 minutes.  Based upon the reasonable beliefs of the officers, their use of weapons in making the stop, placing plaintiff Lavender in handcuffs and detaining plaintiffs for twenty minutes were reasonably related to the basis for stopping the car: investigate a potential robbery suspect and getaway vehicle.  Under these facts, the stop did not rise to an arrest.  See Houston, 174 F.3d 809.

    Therefore, the court being sufficiently advised,

    **IT IS ORDERED** that defendants motions for summary judgment (Doc. #13 and #14) be, and they are, hereby **granted**, and that this action should be dismissed and stricken from the docket of this court.  A separate Judgment shall enter concurrently herewith.

    This 22nd day of November, 2004.



Signed By:
William O. Bertelsman   WOB
United States District Judge